IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

United States, *ex rel.* RICKEY HOWARD,
BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF
AMERICA,

        Plaintiffs,

v.

HARPER CONSTRUCTION
COMPANY, INC., a California
Corporation,

        Defendant.

Case No.:7:12-cv-215-BO

**SECOND AMENDED COMPLAINT
AND JURY DEMAND**

**SECOND AMENDED COMPLAINT OF RELATOR RICKEY HOWARD**

1

# TABLE OF CONTENTS

I.  Introduction ........................................................................................................... 1

II.  Parties ................................................................................................................... 3

III.  Jurisdiction and Venue ......................................................................................... 3

IV.  Respondeat Superior and Vicarious Liability ...................................................... 4

V.  Background on Government Contracting ............................................................. 4

    A.  Federal Contracting Process for Construction Projects Generally ......... 4

    B.  Subcontracting Plans to Benefit Small Business .................................... 6

    C.  Small Business Concerns & Affiliation ................................................. 10

    D.  Post-Award Responsibilities & Obligations Regarding Subcontracting Plans ..... 12

        1.  Duty to Comply in Good Faith With a Subcontracting Plan. ......................... 12

        2.  Duty to Submit Truthful Reports ................................................. 13

        3.  Certifications Made in Progress Payment Requests Include Certification of Good Faith Compliance With Subcontracting Plan .................................. 15

VI.  Factual Allegations .............................................................................................. 16

    A.  Overview of Harper Construction and Former Corporate Defendants ................ 16

    B.  Relator's Discovery of Harper Construction/Frazier Masony's Fraudulent Scheme to Use Sham Small Businesses to Garner Government Contracting Work and Falsely Represent Compliance With Subcontracting Plan Goals ........ 18

        1.  Relator Discovers the Fraudulent Conduct While Working on the Courthouse Bay Project ............................................................... 18

            a. The Courthouse Bay Project ...................................................... 19

            b. Harper Construction Subcontracts With F-Y, an Affiliated, Sham "Small Business" Corporation to Meet Subcontracting Plan Requirements ............................................................... 21

i

2. Relator Learns that Defendants' Fraudulent Conduct is Widespread .............. 34

    a. By Subcontracting with F-Y, Harper Construction Falsely Certified Compliance with its Subcontracting Plans on Government Jobs in California ................................................................................................ 34

    b. Harper Construction Has Engaged in Other Pass-Through Schemes on Government Construction Projects in California ........................................ 43

3. Harper Construction Made False Statements and Submitted False Claims in Connection with the Courthouse Bay Project and the Projects at Camp Pendleton and Los Angeles Air Force Base ..................................................... 47

    a. Harper Construction Did Not Comply in Good Faith with its Subcontracting Plans ............................................................................... 47

    b. Fraud in the Inducement ............................................................................ 48

    c. False Certifications in Progress Payment Requests ................................... 49

    d. False Statements in Subcontracting Plan Reports ...................................... 50

4. Frazier Masonry's Owner/President and Chief Financial Officer Each Pleaded Guilty to a Felony for Their Participation in the Fraud .................... 55

VII. Actionable Conduct by Defendants Under the False Claims Act .................................... 56

    A. The False Claims Act ............................................................................................. 56

    B. Defendant Harper Construction Submitted False or Fraudulent Claims for Payment to the Federal Government ..................................................................... 57

    C. Defendant Harper Construction Made, Used, or Caused to Made or Used False Records and/or Statements Material to False or Fraudulent Claims .................... 58

    D. Defendant Harper Construction Conspired to Commit Violations of the False Claims Act ............................................................................................................. 59

    E. Defendant Harper Construction Failed to Disclose Its Obligation to Repay the Federal Government in Violation of the Reverse False Claims Provisions of the False Claims Act ..................................................................................................... 60

First Claim for Relief (False Claims - 31 U.S.C. §3729(a)(1)(A)) .............................................. 61

Second Claim for Relief (False Statements - 31 U.S.C. §3729(a)(1)(B)) .................................... 61

Third Claim for Relief (Civil Conspiracy to Commit Violations of the False Claims
Act - 31 U.S.C. §3729(a)(1)(C)) ................................................................................................ 62

Fourth Claim for Relief (Reverse False Claims -  31 U.S.C. §3729(a)(1)(G)) ............................ 63

Fifth Claim for Relief (Violation of the Anti-Kickback Act, 41 U.S.C. §53) ............................. 63

Prayer for Relief ........................................................................................................................... 64

NOW COMES PLAINTIFF-RELATOR, Rickey Howard, by and through his attorneys, Charles H. Rabon, Jr. and Marshall P. Walker of Rabon Law Firm, PLLC, Joel M. Androphy of Berg & Androphy, and Matt Abbott, of Abbott Law Firm, LLC, and on behalf of the United States of America, and brings this action under 31 U.S.C. §§3729–3732 (the "False Claims Act") to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States and himself, alleging and stating his Second Amended Complaint against Defendants by way of restatement, and shows the Court as follows:

## I. INTRODUCTION

1. Relator Rickey Howard is a former Project Manager for Frazier Masonry, a large commercial masonry contractor.

2. The False Claims Act violations described in this Complaint concern numerous large construction contracts at military bases in North Carolina and California that were awarded to Defendant Harper Construction.  The contracts were awarded to Harper Construction, in part, based on promises and representations made in its Subcontracting Plans – which were incorporated into and made a material part of the contracts.

3. In performing these contracts, Harper Construction knowingly and inappropriately engaged in two distinct fraudulent "pass-through" schemes in order to create the illusion of compliance with its Subcontracting Plans when the contracts were being performed.  First, Harper Construction knowingly subcontracted with unqualified small businesses that were affiliated with Frazier Masonry, a large business.  The work on these subcontracts was then performed entirely by Frazier Masonry.  Because of the affiliation (which was known by Harper Construction), these companies did not qualify as "small businesses" under the controlling statutes and regulations. Second, Harper Construction contracted with small

1

businesses which, for an administrative fee, then passed through the entire subcontracts to Frazier Masonry.

4. In perpetuation of its fraudulent conduct in the performance of these contracts, Harper Construction made numerous material false statements and certifications to the United States. When submitting its Subcontracting Plans on the projects described in this Complaint, Harper Construction falsely represented that it intended to comply in good faith with its Subcontracting Plans. In addition, the monthly progress payment requests it submitted to the Government on these contracts were false because Harper Construction represented, untruthfully, that it was fulfilling its material obligations to comply in good faith with its Subcontracting Plans. Further, Harper Construction made materially false statements in mandatory reports to the Government regarding its utilization of small businesses in the contracts. In addition, in these same reports, Harper Construction also made materially false statements to cover up its fraudulent conduct.

5. To summarize, the underlying fraud as described in this Complaint includes, but is not limited to:

(1) Inducing the United States to award large military construction contracts by submitting sham Small Business Subcontracting Plans that Harper Construction never intended to follow;

(2) Making materially false statements in mandatory reports and progress payment requests in order to elicit payment from the United States or to conceal its conduct and avoid its obligation to repay money to the federal government; and

(3) Conspiring with Frazier Masonry to submit false claims and/or statements to the United States.

2

## II. PARTIES

6.  Plaintiff-Relator Rickey Howard ("Howard") is a resident of North Carolina.

7.  Defendant Harper Construction Company, Inc. ("Harper Construction") is a California corporation with its corporate headquarters in San Diego, California.

## III. JURISDICTION AND VENUE

8.  This action arises under the False Claims Act, 31 U.S.C. §3729, *et seq*.

9.  Jurisdiction over this action is conferred upon this Court by 31 U.S.C. §3732(a) and 28 U.S.C. §3130 in that this action arises under the laws of the United States.

10. Venue is proper in this district pursuant to 31 U.S.C. §3732(a), which provides that "any action under §3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by §3729 occurred." A substantial part of the proscribed acts, which are the subject of this action, occurred in the State of North Carolina within this judicial district. Additionally, at all times material hereto, corporate defendants Harper Construction, Frazier Masonry, and F-Y regularly conducted business within the State of North Carolina, within this judicial district. Venue is also proper in this district pursuant to 28 U.S.C. §1391(b)(2).

11. There are no bars to recovery under 31 U.S.C. §3730(e). Specifically, this suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media. In the alternative, Relator Howard is an original source as defined therein. Relator Howard has

direct and independent knowledge of the information on which the allegations are based.[1]

Further, substantially the same allegations as those alleged in this suit were not publicly

disclosed in a federal criminal, civil, or administrative hearing in which the Government or

its agent was a party, or in a congressional, Government Accountability Office, or other

Federal report, hearing, audit, or investigation, or from the news media.[2]  In the alternative,

Relator Howard is an original source as defined therein.  Relator Howard has knowledge that

is independent of and materially adds to any publicly disclosed allegations or transactions.

12. Relator Howard has complied with all conditions precedent to the bringing of this action.

## IV.  RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

13. Any and all acts alleged herein to have been committed by the Defendants were committed

by officers, directors, employees, representatives or agents, who, at all times, acted on behalf

of the corporate Defendants and within the course and scope of their employment, such that

Defendants are jointly and severally liable under legal theories of respondeat superior and

vicarious liability.

## V.  BACKGROUND ON GOVERNMENT CONTRACTING

### A.  Federal Contracting Process for Construction Projects Generally

14. The United States Government, along with its departments and subdivisions, engages in

contracting for goods, services, projects, and products on a daily basis.  Among these, the

Government contracts for work related to construction projects at various locations such as

military bases.

15. The Government generally obtains contracts for large construction projects through a

competitive negotiation process that typically involves two phases.

---

[1] This reflects the relevant language of 31 U.S.C. §3730(e) prior to amendments on March 23, 2010.
[2] This reflects the relevant language of 31 U.S.C. §3730(e) as of the date of this filing.

16. The process begins when the contracting officer issues a solicitation that delineates the scope of work and states the Government's requirements, including but limited to design criteria, budget parameters, and schedule.  See FAR 36.302.[3]

17. In Phase I, the solicitation generally covers the technical aspects of the project.  See FAR 36.303-1.  General contractors submit proposals for the project.  The Government then evaluates each offeror's technical competencies and other non-price/cost-related factors against stated evaluation criteria.  The Government then selects the most highly qualified offerors, which generally does not exceed a maximum number specified in the solicitation and, in any case, does not exceed five offerors.  See id.

18. In Phase II, the selected offerors submit proposals that expound upon the technical aspects and include cost proposal data.  See F.A.R. 15.304; FAR 36.303-2.  If the amount of the construction contract at issue is expected to exceed $1,500,000,[4] the offeror's Phase II proposal must include a Subcontracting Plan detailing the extent of participation of small business concerns, which constitutes the "socioeconomic evaluation factor" of the offeror's proposal. See FAR 15.304(c)(4); FAR 19.702.  Subcontracting Plans require large businesses to state the amount of planned subcontracting dollars that "*will go*" to specified categories of small businesses.

19. In awarding these large construction contracts, the Government is not seeking the lowest possible bidder to perform the work.  Instead, the Government is seeking the contractor that can best deliver the full continuum of final product, consistent with all goals, laws, rules and regulations applicable to the product, which expansively include certain requirements for the

---

[3] The Federal Acquisition Regulations (FARs) govern executive agency acquisitions, including the Department of Defense.  The FARs are codified at Title 48, Chapter 1 of the Code of Federal Regulations.

[4] The FAR acquisition thresholds for requiring subcontracting plans were adjusted effective October 1, 2010.  Prior to the adjustment, the threshold for requiring subcontracting plans in construction contracts was $1,000,000.

participation of Small and/or Disadvantaged Business Enterprises through the requisite Small

Business Subcontracting Plan.  See FAR 15.101.  As established in various federal statutes

and regulations, these include business concerns that are Women Owned Small Business

(WOSB's), Veteran Owned Small Business (VOSB's), Service Disabled Veteran Owned

Small Business (SDVOSB's), and the like.

**B.** **Subcontracting Plans to Benefit Small Business**

20. The Small Business Act, 15 U.S.C. §§631–657s, governs the federal government's

procurement policy towards small businesses.  15 U.S.C. §631, in enumerating the purpose

and policy of the Act, states as follows:

> The essence of the American economic system of private enterprise is free
> competition. Only through full and free competition can free markets, free
> entry into business, and opportunities for the expression and growth of
> personal initiative and individual judgment be assured. The preservation and
> expansion of such competition is basic not only to the economic well-being
> but to the security of this Nation. Such security and well-being cannot be
> realized unless the actual and potential capacity of small business is
> encouraged and developed. *It is the declared policy of the Congress that the
> Government should aid, counsel, assist, and protect, insofar as is possible, the
> interests of small-business concerns in order to preserve free competitive
> enterprise, to insure that a fair proportion of the total purchases and
> contracts or subcontracts for property and services for the Government
> (including but not limited to contracts or subcontracts for maintenance,
> repair, and construction) be placed with small-business enterprises*, to insure
> that a fair proportion of the total sales of Government property be made to
> such enterprises, and to maintain and strengthen the overall economy of the
> Nation.

(emphasis added).

21. 15 U.S.C. §637 provides the statutory authority for participation by small businesses in the

performance of contracts let by any Federal agency, including the Department of Defense.

This law specifies that small businesses will have the "maximum practical opportunity" to

participate in performing Government contracts consistent with efficient performance.  15

U.S.C. §637(d)(1). Language reflecting this policy "shall be included" in the pertinent

contracts. 15 U.S.C. §637(d)(2)–(3). The relevant language is set forth in FAR 52.219-8,

"Utilization of Small Business Concerns", which states:

> (a) **It is the policy of the United States that small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns**, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns **shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency**, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. . . .
>
> (b) **The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with efficient contract performance**. . . .
>
> (c) *Definitions*. As used in this contract—
> . . . .
>> **"Service-disabled veteran-owned small business concern"**—
>>> (1) Means a small business concern—
>>>> (i) Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and
>>>> (ii) <u>The management and daily business operations of which are controlled by one or more service-disabled veterans</u> or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.
>>> (2) Service-disabled veteran means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).
>> **"Small business concern"** means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.
>> . . . .
>> **"Veteran-owned small business concern"** means a small business concern—
>>> (1) Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

> > (2) <u>The management and daily business operations of which
> > are controlled by one or more veterans</u>.

(emphasis added).

22. 15 U.S.C. §637 further provides the statutory authority for the FAR that implements the

participation by small business concerns, FAR 19.7, which states, in part:

> Any contractor receiving a contract for more than the simplified
> acquisition threshold must agree in the contract that small business, veteran-
> owned small business, service-disabled veteran-owned small business,
> HUBZone small business, small disadvantaged business, and women-owned
> small business concerns will have the maximum practicable opportunity to
> participate in contract performance consistent with its efficient performance. .
> . .
> (a) Except as stated in paragraph (b) of this section, Section 8(d) of the Small
> Business Act (15 U.S.C. 637(d)) imposes the following requirements
> regarding subcontracting with small businesses and small business
> subcontracting plans:
>
> (1) In negotiated acquisitions, each solicitation of offers to perform a
> contract or contract modification, that individually is expected to
> exceed $650,000 ($1.5 million for construction) and that has
> subcontracting possibilities, shall require the apparently successful
> offeror to submit an acceptable subcontracting plan. If the apparently
> successful offeror fails to negotiate a subcontracting plan acceptable to
> the contracting officer within the time limit prescribed by the
> contracting officer, the offeror will be ineligible for award.

FAR 19.702.

23. Therefore, in accordance with the policy to provide small businesses with the maximum

practicable opportunities to participate in the performance of Government contracts, the

contractor must submit a Subcontracting Plan for the utilization of small businesses in

construction contracts exceeding $1,500,000 (or $1,000,000 if awarded prior to October 1,

2010)..

24. "A Subcontracting Plan is a document setting forth how a contractor will provide [small

business concerns, small disadvantaged business concerns, women-owned small business

concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, and HUBZone small business concerns] with the maximum practicable opportunity to participate in the performance of a contract or subcontract." U.S. Small Business Administration, A Handbook for Small Business Liaison Officers, p. 6 (June 2010), available at

http://www.sba.gov/sites/default/files/Small_Business_Liaison_Officer_(SBLO)_Handbook_6_2010.pdf [hereinafter SBLO Handbook].[5]

25. In its Subcontracting Plan, a contractor is required to include "separate percentage goals using small business (including ANCs and Indian tribes), veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business (including ANCs and Indian tribes) and women-owned small business concerns as subcontractors." FAR 19.704(a).

26. Additionally, in its Subcontracting Plan, a contractor must include a "statement of the total dollars planned to be subcontracted and a statement of the total dollars planned to be subcontracted to small business (including ANCs and Indian tribes), veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business (including ANCs and Indian tribes) and women-owned small business concerns." Id.

27. A Subcontracting Plan must also include a "description of the types of records that will be maintained concerning procedures adopted to comply with the requirements and goals in the plan." Id.

_____

[5] The SBLO Handbook is promulgated by the SBA as a resource for prime contractors and their small business liaison officers. The handbook contains detailed information pertinent to a prime contractor's small business subcontracting program.

28. A contractor who fails to submit a Subcontracting Plan when the threshold dollar amount is met is ineligible to be awarded the contract. See 15 U.S.C. §637(d)(4)(C); FAR 19.702. Further, "[n]o contract shall be awarded to any offeror unless the procurement authority determines that the [small business subcontracting] plan . . . provides the maximum practicable opportunity for small business concerns . . . to participate in the performance of the contract." 15 U.S.C. §637(d)(4)(D).

29. For the successful bidder, the accepted Subcontracting Plan is "included in and *made a material part of the contract*." 15 U.S.C. §637(d)(4)(B) (emphasis added).

### C. Small Business Concerns and Affiliation

30. A "Small Business Concern" is defined as one that is independently owned and operated, is organized for profit, and is not dominant in its field. See 15 U.S.C. §632.

31. 15 U.S.C. §632 also authorizes the Small Business Administration (SBA) to promulgate more specific standards by which a business concern may be deemed to be a small business concern. Pursuant to that authority, the SBA has issued specific size standards which determine whether a business is a small business concern.

32. A Small Business "size standard" is numerical and represents the largest a concern can be and still be considered a small business. See 13 C.F.R. §§121.101; 121.102. Depending on the industry, size standard eligibility is based on the average number of employees for the preceding twelve months or on average annual receipts. Receipts are averaged over a concern's latest three (3) completed fiscal years to determine its average annual receipts. For concerns that have been in business for less than three complete fiscal years, the average annual receipts are the total receipts for the period the concern has been in business divided by the number of weeks in business, multiplied by 52. See 13 C.F.R. §121.104(c).

33. The SBA size standard limitation to qualify as a "Small Business Concern" for businesses in the Specialty Trade Contractors, Masonry Contractors subsector, is $14 million in average annual receipts.  <u>See</u> U.S. Small Business Administration, Table of Small Business Size Standards Matched to North American Industry Classification System Codes, p. 6, http://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf; 13 C.F.R. §121.201.

34. In determining whether an entity qualifies as a small business concern, the SBA counts the receipts of *all* of the entity's <u>domestic and foreign affiliates</u>, regardless of whether those affiliates are organized for profit. <u>See </u>13 C.F.R. §121.103(a)(6).

35. "Affiliation" exists between businesses when one business, directly or indirectly, controls or has the power to control another business, or when a third party, directly or indirectly, controls or has the power to control both businesses.  <u>See</u> 13 C.F.R. §121.103(a); FAR 19.101; <u>SBLO Handbook</u>, <u>supra</u>, at 16.  Control may arise through ownership, management, or other relationships or interactions between the parties.  <u>See</u> 13 C.F.R. §121.103(a).  If one or more officers, directors, managing members, or general partners of a business control the Board of Directors and/or the management of another business, the businesses are affiliates. <u>See</u> 13 C.F.R. §121.103(e).

36. "Affiliation" also exists when there is an identity of interest between individuals or businesses, including family members.  Individuals or firms that have identical (or substantially identical) business or economic interests may be treated as though they are affiliated unless they can demonstrate otherwise.  Family members, persons with common investments, or firms that are economically dependent through contractual (or other) relationships, are among those treated this way.  <u>See </u>13 C.F.R. §121.103(f).

**D.    Post-Award Responsibilities and Obligations Regarding Subcontracting Plans**

**1.    Duty to Comply in Good Faith With a Subcontracting Plan**

37. Each successful prime contractor with a Subcontracting Plan is required to make "a good-faith effort to achieve the dollar and percentage goals and other elements in its subcontracting plan." 13 C.F.R. §125.3.

38. A contractor who fails to comply in good faith with its Subcontracting Plan, including the goals stated therein, or with FAR 52.219-8 ("Utilization of Small Business Concerns") is in *material breach* of its contract. <u>See</u> 15 U.S.C. §637(d)(8); FAR 19.702(c).

39. This good faith obligation is expressly incorporated into all construction contracts requiring a Subcontracting Plan. <u>See</u> FAR 52.219-9(k) ("As prescribed in 19.708(b), insert the following clause . . . The failure of the Contractor or subcontractor to comply in good faith with—(1) The clause of this contract entitled "Utilization Of Small Business Concerns;" or (2) An approved plan required by this clause, *shall be a material breach of the contract*." (emphasis added)).

40. FAR 19.705-7(a) states as follows:

> Maximum practicable utilization of small business, veteran-owned small business, service-disabled veteran owned small business, HUBZone small business, small disadvantaged business and women-owned small business concerns as subcontractors in Government contracts is a matter of national interest with both social and economic benefits. When a contractor fails to make a good faith effort to comply with a subcontracting plan, these objectives are not achieved, and 15 U.S.C. §637(d)(4)(F) directs that liquidated damages shall be paid by the contractor.

41. "Failure to make a good faith effort to comply with the subcontracting plan means willful or intentional failure to perform in accordance with the requirements of the subcontracting plan, or willful or intentional action to frustrate the plan." FAR 19.701.

42. The liquidated damages provision provides a specific, agreed-upon measure for determining the damage to the Government when a contractor fails to comply in good faith with its Subcontracting Plan. Specifically, "[t]he amount of damages attributable to the contractor's failure to comply *shall* be an amount equal to the actual dollar amount by which the contractor failed to achieve each subcontracting goal." FAR 19.705-7(b) (emphasis added). The liquidated damages provision, including the measure of damages stated therein, is required to be incorporated into solicitations and contracts with the Government.[6] See FAR 19.708(b); FAR 52.219-16. Further, "[l]iquidated damages shall be *in addition to any other remedies that the Government may have.*" FAR 19.705-7(g) (emphasis added).

43. Thus, pursuant to the above-referenced statutes and regulations, "[a]n other-than-small contractor that fails to make a good faith effort to achieve the goals in its subcontracting plan may be found in material breach of contract and terminated for default, or liquidated damages may be imposed." SBLO Handbook, supra, at 30.

44. The use of a "pass-through" arrangement, whereby a prime contractor subcontracts with a small business entity which then subcontracts all of the work under the contract to a large business, is not good faith compliance with a Subcontracting Plan. As stated by the SBA: "*[A] pass-through . . . adds little or no value to the procurement. It does not comport with the spirit or intent of the subcontracting program.*" Id. at 77 (emphasis added).

## 2. Duty to Submit Truthful Reports

45. Throughout the contract, contractors must "[s]ubmit periodic reports so that the Government can determine the extent of compliance by the offeror with the subcontracting plan." FAR

---

[6] The liquidated damage provision is an explicit acknowledgement by the contractor that the social and economic objectives of the Subcontracting Plan have measurable value. When the contractor fails to comply in good faith with a Subcontracting Plan, and in particular when a contractor deceives the government, the United States suffers damages.

19.704(a)(10)(ii).  A prime contractor is responsible for submitting "timely, accurate, and complete" reports.  13 C.F.R. §125.3.  Contractors must electronically submit the Individual Subcontracting Report (ISR) and Summary Subcontracting Report (SSR).  <u>See</u> FAR §§19.704(a)(10)(iii); 52.219-9(*l*).

46. The ISR "collects prime contractor and subcontractor subcontract award data" and is required to be submitted by the prime contractor twice a year (by April 30 and October 30 of each year).  <u>Electronic Subcontracting Reporting System (eSRS) Quick Reference for Federal Government Prime Contractors: Submitting an Individual Subcontracting Report (ISR)</u>, pp. 2–3, http://www.esrs.gov/documents/eSRS_Quick_Reference_for_Federal_Government_Prime_Contractors_filing_ISR.pdf.  In the ISR, the prime contractor must provide data showing its small business subcontracting goals vs. its actual performance.[7]  <u>See</u> <u>id.</u> at 13–20.  If the prime contractor fails to meet the goals in its Subcontracting Plan, the contractor must "explain the reason for any shortfalls" in the "Remarks" section of the ISR.  <u>Id.</u> at 20.  When submitting the ISR, the contractor must certify that "the data being submitted on the report is accurate and that the dollars and percentages reported do not include lower tier subcontracts" or the report will be rejected.  <u>Id.</u>

47. The SSR "collects prime and subcontractors' subcontract award data for a specific Federal Government agency" and is required to be submitted twice a year for Department of Defense contracts in the same time frame as the ISR.  <u>Electronic Subcontracting Reporting System (eSRS) Quick Reference Recommendation for Federal Government Contractors: Filing a Summary Subcontracting Report (SSR) for an "Individual" Subcontracting Plan</u>, pp. 2–3,

---

[7] Subcontracting Plan performance is "measured by applying the percentage goals to the total actual subcontracting dollars." FAR 52.219-16.

http://www.esrs.gov/documents/eSRS_Federal_Government_Contractors_filing_SSR_for_Individual_Subcontract_Plan.pdf.  In the SSR, the prime contractor must report all subcontract awards to small business concerns, including the awards to each specific category of small business concern (i.e., woman-owned, service-disabled veteran-owned, etc.).  See id. at 12–15.  When submitting the SSR, the prime contractor must certify that "the data being submitted on the report is accurate and that the dollars and percentages reported do not include lower tier subcontracts" or the report will be rejected.  Id. at 15.  The chief executive officer (CEO) of the company submitting the SSR must approve and "sign a paper print-out" of the report and keep the signed copy on file for four years.  Id. at 16.  "No delegation of authority is accepted."  Id

### 3.  Certifications Made in Progress Payment Requests Include Certification of Good Faith Compliance with Subcontracting Plan

48. In a fixed-price construction contract, the Government makes progress payments to the contractor on a monthly basis as the work proceeds.  See FAR 52.232-5(b).  *Each time* a contractor makes a request for progress payments, the contractor must make "the following certification, *or payment shall not be made*: I hereby certify, to the best of my knowledge and belief, that . . . (1) The amounts requested are only for performance *in accordance with the specifications, terms, and conditions of the contract . . . .*"  FAR 52.232-5(c) (emphasis added).  By making such certification, the contractor attests that the amount of money requested is only for performance in accordance with the requirements of the contract, including performance in accordance with the material contractual obligation to comply in good faith with its Subcontracting Plan and the goals therein.  This mandatory certification provision is required to be inserted into the contract with the contractor and the Government.  See FAR 52.232-5.

49. If the agency discovers that a "contractor's request for . . . progress payments under a contract awarded by that agency is based on fraud" the agency head may "reduce or suspend further payments to the contractor." FAR 32.006-4. "Such reduction or suspension shall be reasonably commensurate with the anticipated loss to the Government resulting from the fraud." Id. The "[a]uthority to reduce or suspend payments . . . is in addition to other Government rights, remedies, and procedures." FAR 32.006-1.

50. Additionally, a contractor has an obligation to timely disclose to the agency when the contractor's principal, employee, agent, or subcontractor has committed a violation of the False Claims Act. See FAR 52.203-13 ("The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General (OIG), with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed . . . A violation of the civil False Claims Act (31 U.S.C. 3729-3733).").

## VI.   FACTUAL ALLEGATIONS

### A.   Overview of Harper Construction and Former Corporate Defendants

51. Harper Construction is ranked among the Top 400 construction companies, the Top 100 Design Build firms, and the Top 100 Green contractors in the United States. According to the San Diego Business Journal, Harper Construction is the second largest privately-held company in San Diego, California. It reported revenues in 2010 of approximately $360 million. Harper Construction earns a substantial portion of its revenues through government contracting. Recently, Harper Construction completed several Bachelor Enlisted Quarters ("BEQs") at Camp Pendleton, California, at a contract price of $140 million – merely one of

several BEQ packages and other major construction projects that Harper Construction has built at Camp Pendleton since 2008. Harper Construction has performed government contracting work for the U.S. military throughout the United States and all around the world, as well as substantial construction work for various state and local governments. It has been reported that in excess of $1.5 billion worth of federal government contracts have been awarded to Harper Construction since 2002.

52. Frazier Masonry Corporation ("Frazier Masonry"), a California corporation with its corporate headquarters in Camarillo, California, is a full-service commercial masonry contractor specializing in brick, stone, and block structures, as well as concrete paving. During the time of the events alleged herein, Frazier Masonry was one of the largest masonry companies in the United States. Frazier Masonry has earned extensive revenues through its work on federal government construction projects, usually as a masonry subcontractor to prime or general contractors. Frazier Masonry was founded in 1974 by Don Frazier and was originally called "Don Frazier and Sons Masonry." In 1985, the company was renamed Frazier Masonry Corporation. In 1988, founder Don Frazier brought his two sons, Defendant Russell ("Russ") Frazier and Michael ("Mike") Frazier [not a defendant], into the family business as partners. Russ and Mike Frazier purchased their father's interest in the company in 2002. At all times relevant hereto, Russ Frazier served as the President of Frazier Masonry.

53. F-Y, Inc. ("F-Y") was incorporated in California on July 20, 2011. Sometime after December 2012, F-Y was dissolved. During F-Y's existence, Defendant Robert Yowell was President of F-Y. Yowell was also an employee of Frazier Masonry during the time he was President of F-Y, and he is married to Holly Frazier, the daughter of Frazier Masonry's

owner Russ Frazier. F-Y represented itself to be a service-disabled veteran-owned small

business (SDVOSB) during its existence. In its corporate records, F-Y listed its primary

place of business as 6965 El Camino Real, Suite 105-618, Carlsbad, California 92009. This

address belonged to a UPS Store/copy shop.

54. CTI Concrete & Masonry, Inc. ("CTI") was incorporated in California on December 30,

2006, as "Concrete Tec, Inc." The name of the company was changed to "CTI Concrete &

Masonry, Inc." in March 2010. CTI is a purported woman-owned small business. The

company was acquired by Russ Frazier in 2009. Since at least August 2012, Russ Frazier's

daughter, Holly Frazier Yowell, has been the CEO, Secretary, CFO, and President of CTI.

55. Masonry Technology, Inc. ("Masonry Tec") was incorporated on April 6, 1994, as "Yocom

Masonry, Inc." The name of the company was changed to "Masonry Technologies, Inc." in

October 2000. Masonry Tec was a purported woman-owned small business. The company

was acquired by Russ Frazier in 2009, but has recently been dissolved.

56. Masonry Works, Inc. ("Masonry Works") was incorporated on September 19, 2008. In June

2009, the name of the company was changed to "Concrete and Masonry Works, Inc." In

August 2010, the name of the company was changed back to "Masonry Works, Inc."

Masonry Works was a purported SDVOSB. The company was acquired by Russ Frazier in

2009, but has recently been dissolved.

    **B.**     **Relator's Discovery of Harper Construction/Frazier Masonry's Fraudulent Scheme to Use Sham Small Businesses to Garner Government Contracting Work and Falsely Represent Compliance with Subcontracting Plan Goals**

        **1.**     **Relator Discovers the Fraudulent Conduct While Working on the Courthouse Bay Project**

57. Relator Howard has been involved in the masonry trade and construction industry his entire

career. Relator Howard was hired by Frazier Masonry at the end of 2011, and began working

as a Project Manager at Frazier Masonry on January 4, 2012.[8]  One of the masonry projects

on which Relator Howard worked as a Project Manager was the Courthouse Bay construction

project at MCB Camp Lejeune (hereinafter "Camp Lejeune").

### a.  The Courthouse Bay Project

58. Camp Lejeune, which opened in September 1941, is the largest Marine Corps Base on the

East Coast, and occupies approximately 246 square miles in Onslow County, North Carolina.

Camp Lejeune is home base for the II Marine Expeditionary Force, 2d Marine Division, 2d

Force Service Support Group, and other combat units and support commands, which amount

to some 47,000 active Marines and Sailors, exclusive of the dependent, retiree, and civilian

employee population which, altogether, totals nearly 150,000 people.

59. On October 17, 2006, the United States Congress authorized an increase in end strength of

the United States Marine Corps (USMC) from 175,000 to 179,000 Marines.  The majority of

the personnel increase is to become permanently stationed at Camp Lejeune.

60. In connection with that increase in force, and at the same time to upgrade the existing

infrastructure at Camp Lejeune, Congress authorized approximately $3.53 billion of military

construction at the base, to be paid from fiscal year budgets 2008 through 2012, with

completion of all construction scheduled for calendar year 2015.

61. One substantial area of new construction taking place at Camp Lejeune is the Courthouse

Bay area of the base, and includes the design and construction of Bachelor Enlisted Quarters,

referred to as "BEQs", as well as other buildings.

62. In early 2011, Naval Facilities Engineering Command Mid-Atlantic in Norfolk, Virginia

("NAVFAC Mid-Atlantic") issued a solicitation [Solicitation Number: N40085-11-R-4009]

---

[8] Relator Howard worked in that position until he left the company in February 2013.

for the construction of BEQs at the Courthouse Bay area of Camp Lejeune (hereinafter "the Courthouse Bay Project").

63. NAVFAC Mid-Atlantic described the project as a "Design/Build contract to construct four 100-room, multi-story bachelor enlisted quarters (BEQs) . . . ." The BEQs are often referred to as the P-1251 and P-1254 BEQs.

64. Harper Construction submitted a proposal to NAVFAC Mid-Atlantic in response to Solicitation Number: N40085-11-R-4009.

65. In Phase II of the negotiation process, as required, Harper Construction included a Subcontracting Plan as part of its proposal for the Courthouse Bay Project, which was one of the bases upon which it was awarded the Contract. In Harper Construction's Subcontracting Plan, Harper Construction represented that a defined amount of the contract would be subcontracted and that specified percentages of the subcontracting work would be awarded to "small business concerns" including HUBZone, WOSB, SDB, VOSB, and SDVOSB concerns. In its Subcontracting Plan, Harper Construction further stated goals that 75% of the total amount of the contract that was to be subcontracted would go to small business concerns. Harper Construction also stated goals that 4% of the total amount to be subcontracted would each go to VOSBs and SDVOSBs (a total of 8%).

66. By submitting its Small Business Subcontracting Plan, Harper Construction certified that it would comply in good faith with the requirements of that plan, as well as with the applicable statutory and regulatory requirements, including, but not limited to 15 U.S.C. §637, FAR Subpart 19.7, and FAR §§52.219-8 and 52.219-9.

67. By submitting its Small Business Subcontracting Plan, Harper Construction understood that the United States would rely upon the statements in the Subcontracting Plan to determine

whether the plan was bona fide, and Harper Construction knew that if it was awarded the Courthouse Bay contract, its Subcontracting Plan would be included in and made a material part of that contract.

68. The United States, through the United States Navy and Naval Facilities Engineering Command ("NAVFAC"), reviewed and relied upon the statements that Harper Construction made in its Subcontracting Plan in determining that Harper Construction had submitted an acceptable bid on the Courthouse Bay Project. Had Harper Construction not submitted a Subcontracting Plan, it would have been ineligible even to bid on the contract. Had the United States not relied on the statements that Harper Construction made in its Subcontracting Plan, it would not have awarded Harper Construction the Courthouse Bay contract.

69. On August 31, 2011, Harper Construction was awarded the Courthouse Bay contract with a total original value of $67,681,224.

70. Harper Construction's Subcontracting Plan that it submitted to the United States as part of its proposal on the Courthouse Bay Project – which the Government approved and accepted – was incorporated into and made a material part of the contract between Harper Construction and the Government.

### b. Harper Construction Subcontracts With F-Y, an Affiliated, Sham "Small Business" Corporation to Meet Subcontracting Plan Requirements

71. As early as July 13, 2011, Frazier Masonry and Harper Construction began discussing the masonry work on the Courthouse Bay Project.

72. Frazier Masonry submitted its first proposal to Harper Construction for the masonry subcontract work on the Courthouse Bay job on November 28, 2011. Frazier Masonry

submitted revised proposals to Harper Construction on March 9, 2012, March 12, 2012, April 5, 2012, April 12, 2012, April 18, 2012, April 20, 2012, and May 30, 2012. A true copy of Frazier Masonry's bid proposal dated April 5, 2012, is attached hereto as **Exhibit 1**.

73. Russ Frazier explained to Relator Howard that Frazier Masonry had an excellent chance of being awarded the masonry subcontract based on Frazier Masonry's prior relationships with Harper Construction from having worked together on numerous federal government construction projects and private projects on the West Coast. Russ Frazier also specifically stated that Harper Construction was Frazier's "best customer" on the West Coast.[9]

74. On April 12, 2012, Relator Howard attended a meeting with Russ Frazier and Andy Anello (Harper Construction's Courthouse Bay Project Manager) regarding the Courthouse Bay Project. During the meeting, Harper Construction's Andy Anello stated that a "small business company would need to be used" in order for Frazier Masonry to get the masonry subcontract. Russ Frazier explained to Anello that he could use *his* disabled-veteran owned small business company called F-Y.

75. As a result of this conversation, in which Russ Frazier essentially claimed ownership and control of F-Y, Andy Anello, and therefore Harper Construction, knew that F-Y was controlled, directly or indirectly, by Frazier Masonry and/or Russ Frazier and, therefore, that Frazier Masonry and F-Y were affiliated.

76. F-Y and Frazier Masonry were clearly affiliated companies, and as such, under the SBA Affiliation Rules, *all* the revenues of Frazier Masonry were required to be attributed to F-Y for the purpose of determining whether F-Y, in fact, could actually count as a "small business." At all times relevant, Frazier Masonry itself did not qualify as a small business

---

[9] In fact, in 2008, Frazier Masonry was asked by Harper Construction to offer their services exclusively to Harper Construction on all BEQ proposals at Camp Pendleton in California.

under SBA size standards,[10] and thus F-Y could not possibly have qualified as a small

business, either, for purposes of good faith compliance with the Subcontracting Plan.

77. At all times relevant, F-Y was controlled by Frazier Masonry and its individual owner, Russ

Frazier.

78. F-Y's only source of construction contracts was through Frazier Masonry. F-Y was formed at

the direction and behest of Russ Frazier solely for the purpose of serving as a small business

"front" so that prime contractors, such as Harper Construction, could report compliance with

their Subcontracting Plan goals. In fact, the idea to form F-Y was sparked by a conversation

between Russ Frazier and Brad Humphrey (Harper Construction Vice President of

Construction) wherein Humphrey told Russ Frazier that it would be "beneficial" to Frazier

Masonry for it to "partner" with a small business contractor.[11] F-Y was not a genuine

masonry company. All of its contracts were completely performed by Frazier Masonry, a

large business.

79. The *only* two persons who were ever employed by F-Y during its existence were Rob Yowell

and Holly Frazier Yowell. Rob Yowell is Russ Frazier's son-in-law and a key employee and

Project Manager of Frazier Masonry, a position in which Yowell continued after becoming

employed with F-Y. Holly Frazier Yowell is married to Rob Yowell and is Russ Frazier's

daughter. Russ Frazier has acknowledged that the "F" in F-Y stands for "Frazier" and the

---

[10] As noted above, Frazier Masonry was one of the largest masonry subcontractors in the United States and could not qualify as a small business under the relevant regulations. Further, Harper Construction has never contracted with Frazier Masonry as a small business, and there are numerous statements from Harper Construction employees acknowledging Frazier Masonry's large business status, some of which are specifically mentioned herein.

[11] Harper Construction has engaged a practice whereby it would subcontract with actual small businesses which would then subcontract out the entire scope of work to large businesses, such as Frazier Masonry. See *infra* Part VI.B.2.b. To induce these small businesses to go along with this pass-through scheme so that Harper Construction could fraudulently claim compliance with its Subcontracting Plan goals, Harper Construction would have to pay these small businesses a "facilitation fee" of approximately 1–2% of the subcontract value. Because of this, Harper Construction pressured companies like Frazier Masonry to supply a subcontractor that did not require a fee. Obviously, it was not necessary to pay a fee to F-Y since F-Y and Frazier Masonry were one and the same.

"Y" stands for "Yowell."

80. As a prime contractor to the United States government on projects for which Subcontracting Plans are required, Harper Construction is charged with knowledge of – and the duty to comply with – SBA rules and regulations, including the SBA Affiliation Rules.

81. Harper Construction knew from its initial use of F-Y in 2011 that F-Y was controlled, directly or indirectly, by Frazier Masonry and/or Russ Frazier and, therefore, that Frazier Masonry and F-Y were affiliated such that F-Y could not legitimately qualify as a small business.

82. In September 2011, less than two months after F-Y was incorporated, Harper Construction awarded a $3,463,800 masonry and concrete subcontract to F-Y on a Recruit Barracks construction job at Camp Pendleton in California (P-1069). The work was then performed in its entirety by Frazier Masonry.[12]

83. Jeff Harper, the President and 100% shareholder of Harper Construction, had a close relationship with Russ Frazier and was personally aware, at least as early as May 12, 2011, prior to the P-1069 subcontract, of who Rob Yowell was and his relationship to Russ Frazier, having been introduced to Rob Yowell by Russ Frazier as his "future son-in-law." Jeff Harper has also remarked that he was aware that Frazier Masonry "populated F-Y."

84. Mike Firenze, a Project Manager for Harper Construction – and specifically the Project Manager on the P-1069 job – was also present at the May 12, 2011 industry dinner and spoke extensively with Rob Yowell and Holly Frazier regarding their upcoming wedding plans.

85. Rob Yowell, in his capacity as a Frazier Masonry employee, acted as a Project Manager for Frazier Masonry on several Harper Construction projects.[13] Yowell's involvement was

---

[12] The P-1069 project is addressed in more detail below in Part VI.B.2.a.
[13] Rob Yowell became a Project Manager for Frazier Masonry in May 2009.

especially significant on the BEQ Package 5 project at Camp Pendleton,[14] a project on which Mike Firenze also served as Harper Construction's Project Manager. Yowell's allocated salary on that project was nearly $70,000.

86. Many other Harper Construction employees, including, but not limited to, Dave Golden (Harper Construction Vice President of Pre-Construction) and Kristina Benson (Harper Construction Project Coordinator), who also interacted frequently with Holly Frazier Yowell, were aware of Rob Yowell's connections with Russ Frazier and his affiliation with Frazier Masonry as a result of Yowell's interactions with Harper Construction in his Frazier Masonry Project Manager capacity.

87. In addition, Holly Frazier Yowell was the administrative contact for Frazier Masonry on BEQ Package 5.

88. Further, at least as of April 12, 2012, Andy Anello knew that Russ Frazier owned or controlled F-Y. That knowledge is imputed to Defendant Harper Construction.

89. On April 16, 2012, when Relator Howard expressed concerns to Russ Frazier regarding Frazier Masonry's "use" of F-Y to "get the contract," Russ Frazier responded that "*It will be the last thing they [the Government] will be looking for on the East Coast*." Russ Frazier continued by saying: "*All the liability will fall on the General Contractor [Harper Construction] and on F-Y, none on Frazier. We do it all the time on the West Coast. I don't know how much it is done on the East Coast*."

90. On April 20, 2012, Andy Anello informed fellow co-workers, Brian Crowley (Design Manager at Harper Construction) and Kenton Ahrentzen (also an employee of Harper Construction), that "*we [Harper Construction] have made a deal with **Frazier Masonry** for*

---

[14] Harper was awarded the BEQ Package 5 project on October 6, 2009. The project was completed on August 6, 2011.

*the BEQ project at Camp Lejeune*." A true copy of the April 20, 2012 email from Andrew Anello to various team members is attached hereto as **Exhibit 2**.

91. According to statements made by Andy Anello to Relator Howard, Frazier Masonry was not the low bidder on the masonry work for the Courthouse Bay Project. Anello's statement (on behalf of Harper Construction) suggests that Harper Construction contracted with Frazier Masonry for the nefarious purpose of reporting Subcontracting Plan compliance – because Frazier Masonry could ensure that F-Y held the subcontract but that Frazier Masonry would perform the work.

92. In response to Anello's April 20th email announcing the deal with Frazier Masonry, Russ Frazier emailed Anello, copying various members of Frazier Masonry, including Rob Yowell at his F-Y email address (rob.fyi@gmail.com), asking Anello to provide Harper Construction's project team names and contact information. Anello responded with several names, including Kristina Benson, "Project Coordinator", for Harper Construction.

93. On April 23, 2012, Kristina Benson, in an email addressed to the "Frazier Team", asked if someone "could direct [her] to the certified payroll contact *at Frazier*" (emphasis added). Rob Yowell, from his F-Y email address, responded: "Jamie Bello in *our* corporate office: jamieb@fraziermasonry.com" (emphasis added). A true copy of those emails is attached hereto as **Exhibit 3**.

94. On April 20, 2012, eight days after the meeting wherein Andy Anello stated that a "small business would need to be used" and wherein Russ Frazier offered his small business, F-Y, Andy Anello sent Russ Frazier an email asking him to "*send [Anello] a proposal on the letterhead of the disabled veteran company*." Up to this point, *Frazier Masonry* had sent at least seven proposals for the masonry work on the Courthouse Bay Project. *F-Y* had never

sent a proposal. A true copy of the Andy Anello's April 20, 2012 email is attached hereto as **Exhibit 4**.

95. On April 24, 2012, Relator Howard became increasingly more concerned about the "arrangement" between Frazier Masonry and Harper Construction after receiving a forwarded e-mail from Russ Frazier. In the email, Andy Anello stated as follows to Russ Frazier: *"We [Harper Construction] are close to an agreement with TKE (ThysennKrupp) Elevators for the CHB [Courthouse Bay] project. They **too** are a large business and I need to contract them as a small biz. Have **you** ever taken on the elevator contract as well?"* (emphasis added). Through this email, Anello was inquiring as to whether Frazier Masonry had ever "taken on" an elevator contract – as a "pass-through" – through one of its sham small businesses, such as F-Y, and whether Frazier Masonry would be willing to do so at Courthouse Bay, such that TKE would actually perform the elevator contract and Harper Construction could claim the elevator contract as a "small business contract." A true copy of the April 24, 2012 email from Russ Frazier to Relator Howard is attached hereto as **Exhibit 5**.

96. Over the next several days, Harper Construction and Frazier Masonry team members exchanged e-mails regarding the design requirements for the BEQs, changes to the masonry plan, and setting up a "roundtable" meeting between the companies to discuss the scope of the masonry subcontract for Courthouse Bay and "small business participation" via subcontracts needed on the project in order to fulfill the Subcontracting Plan.

97. On April 25, 2012, Rob Yowell emailed Harper Construction employees, Tamara Tatman, Michelle Baril, and Patricia Wright (Harper Construction Contracts Administrator), with a letter providing alternate contact information for Yowell during his two-week absence from

work for his honeymoon with Holly Frazier. Yowell instructed those Harper Construction employees to "*please pass this letter along to any other administrative staff in your office who may find this information useful*." The letter states that during Yowell's absence, "*Debbie Wall [Frazier employee] and Gary Cox [Frazier Chief Financial Officer] will have full authority to handle any administrative needs that may arise on my behalf*." The letter included the contact information for Wall and Cox, including their Frazier Masonry emails and telephone numbers.

98. On or about May 1, 2012, Relator Howard attended the roundtable meeting between Harper Construction and Frazier Masonry at the Harper Construction jobsite trailer at Camp Lejeune. At the meeting, Russ Frazier pulled Relator Howard into a separate closed-door meeting with Harper Construction's Andy Anello, in which Anello and Frazier discussed the possibility that material for the project would be bought through the small business, F-Y, but that all the fees would stay in a Frazier Masonry contract. Anello and Frazier discussed how the total $9.2 million contract would be split into two components: $4.5 million to F-Y for material and $4.7 million to Frazier Masonry for labor. After the meeting, Russ Frazier and the rest of the Frazier Masonry team flew back to the West Coast, leaving Relator Howard to manage the project. The $4.5 million/$4.7 million discussion never came to fruition.

99. At this point, it was clear that Frazier Masonry was using F-Y, "its" small business company, in order to "get" the masonry subcontract so that Harper Construction would be able to claim F-Y toward its Small Business Subcontracting Plan goals. Moreover, Harper Construction knew at this point that such an arrangement violated the SBA affiliation rules and would be a fraud upon the Government. Nonetheless, Harper Construction proceeded with the scheme.

100.    On May 1, 2012, Harper Construction's Project Manager, Andy Anello, sent an email to

Patricia Wright (Harper Construction Contracts Administrator), and copied Russ Frazier,

with the subject line: "**F Y Incorporated Frazier SDVOSB**".  Anello instructed Patricia

Wright to review the attachment to the email and to alert other Harper Construction

employees, and stated that "*we need Frazier Masonry laying block in 2 ½ - 3 weeks.*"  The

document attached to the email was entitled "Frazier Masonry Schedule B 4-18-12.doc".[15]

However, the attached document was actually a Schedule "B" for F-Y, the affiliated, pass-

through company.  A true copy of the May 1, 2012 email and the F-Y Schedule "B" is

attached hereto as **Exhibit 6**.

101.    On May 8, 2012, in a conversation regarding material orders on the Courthouse Bay

Project, Russ Frazier told Relator Howard, with regard to the situation with F-Y, that _Harper_

_Construction_ "*had to get some small business credit and _they_ had to do this.*"

102.    In the May 8, 2012 conversation, Russ Frazier additionally stated that Frazier Masonry

was "*enrolled on two or three of their [Harper Construction's] projects rights now.*" Around

the time of the Courthouse Bay Project, Harper Construction was in fact using Frazier

Masonry as its masonry subcontractor on at least two projects at Camp Pendleton and Los

Angeles Air Force Base.

103.    On those projects, the work was passed through F-Y in the same manner as on the

Courthouse Bay Project – that is, by using a sham company with essentially no employees

and which was controlled by, and therefore "affiliated" with, Frazier Masonry.

104.    Almost a week later, on May 14, 2012, Russ Frazier informed Relator Howard that the

*entire* subcontract was then to be executed between Harper Construction and F-Y, as opposed

---

[15] The Schedule "B" lays out the scope of work and obligations of the subcontractor.

to the two separate contracts discussed earlier. F-Y would then, in turn, "subcontract" the entire subcontract to Frazier Masonry.

105.     A Payment and Performance Bond (Bond Number 6070996) for the Courthouse Bay Project was issued bearing the date of May 17, 2012, on behalf of F-Y, as Principal, through Westfield Insurance Company, as Surety, in the amount of $9,157,220.00. The Bond states that F-Y entered into a subcontract with Harper Construction dated May 8, 2012, although the subcontract with F-Y was not actually executed by F-Y until a short while later, evidently on or about May 16, 2012.

106.     The subcontract between Harper Construction and F-Y, dated May 8, 2012, recites an initial amount of $9,157,220 and a changed amount to $9,173,504. The CCIP Insurance Credit form in the subcontract indicates that "All Labor is being subcontracted to Frazier Masonry."[16] The form additionally lists Mark Horwedel as the "Primary Contact" of F-Y, along with his Frazier email address. The Harper Construction/F-Y Courthouse Bay subcontract was signed by Rob Yowell and by Harper Construction's owner and CEO, Jeff Harper.

107.     On May 21, 2012, Relator Howard attended a meeting with Russ Frazier and Parrish Hoffman, a sales representative for Adams Concrete, concrete vendor for this job, about the purchase of building materials for the Courthouse Bay Project. At the meeting, Russ Frazier explained to Hoffman that "*Harper's got some challenges on their end meeting their small business goals*" and so Harper Construction "*want[ed] to run part of [Frazier Masonry's] contracts through*" F-Y. Russ Frazier further stated that Frazier Masonry would guarantee the concrete purchases, and that Harper Construction would issue joint checks for payment to F-Y and Adams Concrete for the materials. Russ Frazier stated that all Purchase Orders

---

[16] CCIP stands for "contractor controlled insurance program."

should list F-Y, but that the bills and invoices for materials should be sent to Frazier Masonry's North Carolina office for processing and coding, and that the payments would be made from California. Russ Frazier further stated that Frazier Masonry would fill out a credit application for F-Y.

108.    On May 22, 2012, Relator Howard attended a meeting at the Courthouse Bay job site with Russ Frazier, Andy Anello, and Les Willigar (Harper Construction Vice President of Construction). During the meeting, a discussion arose regarding the CCIP premiums with the F-Y subcontract (The CCIP premium amount for the subcontract was supposed to be the responsibility of the subcontractor). Anello, addressing Frazier, stated that the issue "*was with you guys' CCIP and GL ratings where the Frazier rates are trying to be applied to F-Y.*" Application of the more favorable Frazier rate would, evidently, have resulted in a lower premium amount than application of the F-Y rate. Anello stated that the difference in the premiums was $16,000, which Anello was seeking to charge to Frazier Masonry. Russ Frazier responded, "*Well from my perspective, I felt like that given we're hopefully providing the value there by providing the small business and not charging anything for it . . . .*" At that point, Les Willigar ended the debate over the issue, declaring, "*We'll pay the sixteen thousand. We'll pay that.*" Willigar then asked if the contract had been executed. Andy Anello explained that the contract had been "*signed by Russ, or Rob, but it's not signed by Jeff [Harper].*" In response, Les Willigar directed Anello to "*take the dollar amount, initial it, and move on before it goes up to Jeff. Add $16,000 for a bill and send it upstairs.*"

109.    Consistent with Willigar's executive decision, the subcontract between F-Y and Harper Construction on the Courthouse Bay Project in fact shows that the premium was originally

listed as $42,780 and was changed to $26,496 – representing the $16,000 CCIP charge that Harper Construction picked up.

110. Around this same time, Relator Howard learned that Mark Horwedel would be coming from the West Coast to act as the "Official" Project Manager of the Courthouse Bay Project on behalf of Frazier Masonry, but that Relator Howard would remain "in charge" of the everyday operations at Courthouse Bay.

111. On May 24, 2012, Relator Howard discussed the mechanics of the arrangement between Frazier Masonry and F-Y with Horwedel, so that Relator Howard would be able to deal with any questions relating to the material vendors arrangements while Horwedel was out of town. Horwedel explained that Frazier Masonry would act as a "Second Tier" subcontractor to F-Y on the project, and that "*this is how we've had to handle minority participation several times over the last seven years*" – including on earlier such arrangements on Harper Construction projects.

112. On or about May 25, 2012, Frazier Masonry began the masonry work on the Courthouse Bay Project.

113. On November 9, 2012, Harper Construction issued a change order to F-Y to be executed by both Harper Construction and F-Y. The document shows that Russ Frazier, not Rob Yowell, signed as "President" on behalf of "F-Y, Inc." on November 13, 2012. Once again, this action cemented knowledge of the affiliation between F-Y and Frazier – a fact long known to Harper Construction. The November 9, 2012 change order is attached hereto as **Exhibit 7**.

114. Although Harper Construction subcontracted with F-Y for the masonry work, the entirety of performance and management of the masonry subcontract was accomplished by Frazier

Masonry employees. The only persons who were ever "employed" by F-Y were Rob Yowell (who simultaneously was a Project Manager for Frazier Masonry), and Holly Frazier Yowell – Russ Frazier's daughter and Rob Yowell's new wife.

115.     Almost all of the paperwork that was prepared or issued for F-Y was in fact prepared or issued by Frazier Masonry employees. Even after the subcontract was "issued" to F-Y, Frazier Masonry submitted a revised quote to Harper Construction for the work on May 30, 2012. Both F-Y and Frazier Masonry occupied the same field office at the Courthouse Bay Project, and all invoices for materials on the Courthouse Bay Project were sent to Frazier Masonry's North Carolina P.O. Box and coded by a Frazier Masonry employee before being sent to F-Y for "accounting purposes." No "employee" of F-Y, Inc. ever went to Camp Lejeune or set foot on the base in the performance of the Courthouse Bay BEQ masonry subcontract between F-Y, Inc. and Harper Construction.

116.     In December 2012, when the Government was investigating possible fraud by Frazier Masonry in connection with the Courthouse Bay project, a search warrant was executed upon the premises of Frazier Masonry and F-Y.

117.     Russ Frazier soon thereafter contacted his friend, Jeff Harper, to alert him of the Government's investigation.

118.     In response, on or about December 24, 2012, Harper Construction abruptly and unilaterally terminated all contracts between itself and F-Y, including as to the Courthouse Bay Project.

119.     As a result of the terminations by Harper Construction, Frazier Masonry was required to immediately wind down its operations on these contracts at Camp Lejeune and Camp Pendleton, and to remove all of its property and personnel from the jobsites. In further

consequence of Harper Construction's abrupt termination of all contracts with F-Y, Harper Construction instructed its personnel to have no contact whatsoever with Russ Frazier.

120.    Harper Construction was scheduled to complete the work on the Courthouse Bay Project at Camp Lejeune on January 28, 2014.

121.    Throughout the performance of the Courthouse Bay Project, Harper Construction submitted certified monthly progress payment requests pursuant to FAR 52.232-5, which the Government paid.

### 2.    Relator Learns that Defendants' Fraudulent Conduct is Widespread

### a.    By Subcontracting with F-Y, Harper Construction Falsely Certified Compliance with its Subcontracting Plans on Government Projects in California

122.    Mark Horwedel admitted to Relator Howard in a conversation on May 24, 2012, that Frazier Masonry had engaged in similar schemes as described above several times over the past seven years.  In a later conversation, Horwedel specifically told Relator Howard that Frazier Masonry had used the same set-up with F-Y on a construction project at Camp Pendleton in California.  More specifically, Horwedel stated to Relator Howard that Frazier Masonry has utilized various companies controlled by and affiliated with Frazier Masonry and/or Russ Frazier that amount to "sham" small businesses, to help general contractors fulfill Subcontracting Plan requirements on various federal government construction projects on the West Coast.

123.    On June 21, 2012, Mark Horwedel told Relator Howard that "*you [meaning companies like Frazier Masonry] can't do the work if you don't*" use companies like F-Y to abet prime contractors, such as Harper Construction, in reporting "compliance" with their Subcontracting Plan goals.  Horwedel further elaborated: "*It gets to the point where, Harper*

*says . . . 'Okay, we want to give you the job for that amount of money, but we need this, we need this, we need this.'"*

124.    Frazier Masonry's November 26, 2012 Job Report contains numerous jobs listing Frazier

Masonry as the subcontractor to F-Y, Inc., CTI Concrete & Masonry, Inc., CTI Concrete &

Masonry Tec, or Masonry Works.  A true copy of Frazier Masonry's Job Report is attached

hereto as **Exhibit 8.**

125.    Just as with F-Y, Russ Frazier owned and/or controlled CTI, Masonry Tec, and Masonry

Works, and these companies existed only as "sham small businesses" to fulfill Small

Business Plan Subcontracting requirements for large general contractors, such as Harper

Construction, on government construction projects.

126.    Russ Frazier acquired CTI, Masonry Tec, and Masonry Works merely to utilize those

companies to facilitate fraudulent pass-through schemes for the benefit of Frazier Masonry

and prime contractors, such as, Harper Construction, which then would assert compliance

with its Subcontracting Plan goals.  According to Mark Horwedel, in a conversation with

Relator Howard on June 21, 2012, Russ Frazier used CTI, Masonry Tec, and Masonry Works

on projects at Camp Pendleton "the same way [Frazier Masonry did] with F-Y" on the

Courthouse Bay Project.

127.    In addition to the Courthouse Bay Project, the November 26, 2012 Job Report contained

at least three other jobs that reflect sham arrangements between Harper Construction and F-Y

for the purpose of falsely certifying good faith compliance with Small Business Plan

Subcontracting goals on various large contracts that Harper Construction had been awarded

by the federal government at Camp Pendleton in California.  Those include the P-1069

Recruit Barracks project, BEQ's P-1109 and P-1113, and the CNATT Aviation Training Facility project.

128. Harper Construction was awarded the P-1069 Recruit Barracks construction job (hereinafter "P-1069") at Camp Pendleton on September 21, 2010. The total original value of the prime contract was $48,523,000. As part of its proposal, Harper Construction submitted a Subcontracting Plan which was approved and accepted by the Government, and which became a material part of Harper Construction's contract with the Government.

129. Going back at least to June 4, 2010, Frazier Masonry engaged in discussions with and submitted proposals to Harper Construction for the concrete and masonry work on P-1069.

130. In approximately early May 2011, Harper Construction awarded the masonry and concrete subcontract to Masonry Works, another company owned and controlled by Russ Frazier and Frazier Masonry, which was then to subcontract and pass through the entirety of the contract to Frazier Masonry.

131. As with the Courthouse Bay Project, all proposals for the masonry and concrete work leading up to the contract award were submitted by Frazier Masonry – and none were submitted by Masonry Works.

132. In a June 30, 2011 email, entitled "Concrete & Masonry Work, Inc.", sent to Daniel Spurio (Frazier employee), Patricia Wright (Contracts Administrator for Harper Construction) wrote:

> *In anticipation of <u>issuing you a subcontract under this new company name</u> for our P-1069 project, there are a couple things I need:*
> *1.) The attached W-9 completed and returned for this company, via e-mail or fax.*
> *2.) A current contractor's license no. for this company.*
>
> *Thank you in advance for your help with this* ☺

(emphasis added). Thereafter, the masonry subcontract was issued by Harper Construction to Masonry Works.

133. However, in late August 2011, a decision was made to void the contract with Masonry Works, and to issue a subcontract for the work to F-Y instead.

134. On August 22, 2011, Gary Cox, Frazier Masonry's CFO, emailed Mike Firenze (Harper Construction Project Manager on P-1069) with an "information sheet" on F-Y "pursuant to [Firenze's] conversation with Russ [Frazier]" earlier that day. This information sheet stated, among other information, that F-Y had been formed less than five weeks earlier on July 20, 2011, that F-Y was applying for Service-Disabled Veteran-Owned Small Business (SDVOSB) certification, and that "Robert A. Yowell" was the "President" of F-Y. Just prior to this, Mike Firenze had, for months, worked extensively with Rob Yowell, as a Frazier Masonry Project Manager, on the BEQ Package 5 project. A true copy of the August 22, 2011 email and "information sheet" for F-Y is attached hereto as **Exhibit 9**.

135. On August 24, 2011, Mike Firenze internally emailed Patricia Wright and instructed her to void the subcontract to Masonry Works and to issue the attached P-1069 concrete and masonry subcontract to F-Y instead. Along with the email, Firenze also attached the previously mentioned information sheet for F-Y. Additionally, in the email to Patricia Wright, Firenze listed the person of contact as "Daniel Spurio", along with his Frazier Masonry email address. Thus, the contact person for the F-Y concrete and masonry subcontract was, in fact, a Frazier Masonry employee.

136. On September 8, 2011, Harper Construction subcontracted the masonry work on P-1069 to F-Y in the amount of $2,486,800. In addition to the masonry work, the building concrete work was subcontracted to F-Y in the amount $977,000, for a total of $3,463,800. The

subcontract agreement was signed by Rob Yowell on September 15, 2011, and by Harper Construction's owner and CEO, Jeff Harper, on September 19, 2011. F-Y had been in existence for less than two months at that time.

137. The P-1069 subcontract lists F-Y as a "SDVOSB". Further, the subcontract mandates that the scope of work within the subcontract be subcontracted, "in its entirety, to Frazier Masonry to perform the work herein." The CCIP Insurance Credit form in the subcontract further indicates that "All Labor is being subcontracted to Frazier Masonry." The form additionally lists "Daniel Spurio" as the "Primary Contact" for F-Y, with his email as "DanielS@FrazierMasonry.com".

138. The masonry and concrete work on P-1069 was then performed, in its entirety, by Frazier Masonry.

139. After the masonry and concrete subcontract for P-1069 was issued to F-Y, Harper Construction claimed the F-Y subcontract toward its Subcontracting Plan goals and certified that it was complying in good faith with its Subcontracting Plan, despite the fact that it knew that F-Y could not actually qualify as a small business because of its affiliation with Frazier Masonry.

140. Harper Construction was scheduled to have completed P-1069 on March 4, 2013.

141. During the performance of P-1069, Harper Construction submitted certified monthly progress payment requests pursuant to FAR 52.232-5, which the Government paid.

142. Harper Construction was awarded the BEQ P-1109 and P-1113 construction job (hereinafter "P-1109/P-1113") at Camp Pendleton on September 29, 2011. The total original value of the prime contract was $68,696,948. As part of its proposal, Harper Construction

submitted a Subcontracting Plan which was approved and accepted by the Government, and which became a material part of Harper Construction's contract with the Government.

143.   As early as July 20, 2011, Frazier Masonry and Harper Construction discussed the masonry and concrete work on P-1109/P-1113. Thereafter, Frazier Masonry submitted numerous proposals for the work.

144.   By at least September 2012, a decision had been made to award the masonry and concrete subcontract to F-Y, which was then to subcontract and pass through the entirety of the contract to Frazier Masonry.

145.   Rich Davies (Harper Construction Senior Project Manager) sent an email on September 4, 2012, to Daniel Spurio, Russ Frazier, Rob Yowell, and Jason Hamblin stating: "***Team Frazier*** – *I am in the process of finalizing your subcontract before sending to Brad [Humphrey] for his final review. I would appreciate your help in distributing the money in the right spot . . . .*" (emphasis added).

146.   On September 10, 2012, Davies emailed the F-Y Schedule "B" for P-1109/P-1113 to Patricia Wright, copying Russ Frazier and Brad Humphrey (Harper Construction Vice President of Construction). In the email, Davies wrote: "*Hi Patty- Attached is the subcontract scope of work for Building Concrete and Bldg/Site Masonry to **FY-Inc.** for the new BEQ P1109/P1113. (**they are a small business entity affiliated with Frazier Masonry**) They will needed [sic] on-site in early October 2012.*" (emphasis partially added). A true copy of the September 10, 2012 email is attached hereto as **Exhibit 10**.

147.   Through a subcontract dated September 17, 2012, and fully executed on October 12, 2012, the masonry and concrete work on P-1109/P-1113 was subcontracted to F-Y in the amount of $9,680,000. The CCIP Insurance Credit form in the subcontract further indicates

that "All Labor is being subcontracted to Frazier Masonry." The form additionally lists "Daniel Spurio" as the "Primary Contact" for F-Y, with his email as "DanielS@FrazierMasonry.com". Once again, the contact person for this "F-Y" job was, in fact, an employee of Frazier Masonry. The Harper Construction/F-Y P-1109/P-1113 subcontract was signed by Rob Yowell and by Harper Construction owner and CEO, Jeff Harper.

148.    After the masonry and concrete subcontract for P1109/P1113 was issued to F-Y, Harper Construction claimed the F-Y subcontract toward its Subcontracting Plan goals and certified that it was complying in good faith with its Subcontracting Plan, despite the fact that it knew that F-Y could not actually qualify as a small business because of its affiliation with Frazier Masonry.

149.    Harper Construction was scheduled to have completed P1109/P1113 on March 11, 2014.

150.    During the performance of P1109/P1113, Harper Construction submitted certified monthly progress payment requests pursuant to FAR 52.232-5, which the Government paid.

151.    Harper Construction was awarded the CNATT Aviation Training Facility construction job (hereinafter "the CNATT Project") at Camp Pendleton on September 12, 2011. The total value of the prime contract was $40,228,805. As part of its proposal, Harper Construction submitted a Subcontracting Plan which was approved and accepted by the Government, and which became a material part of Harper Construction's contract with the Government.

152.    The masonry work on the CNATT Project was subcontracted to F-Y in the amount of $4,877,000. The CNATT subcontract, like the subcontract for P-1109/P-1113, was dated September 17, 2012, and was fully executed on October 12, 2012. The CNATT subcontract was signed by Rob Yowell and by Harper Construction's owner and CEO, Jeff Harper.

153.     After the masonry subcontract for the CNATT Project was issued to F-Y, Harper

Construction claimed the F-Y subcontract toward its Subcontracting Plan goals and certified

that it was complying in good faith with its Subcontracting Plan, despite the fact that it knew

that F-Y could not actually qualify as a small business because of its affiliation with Frazier

Masonry.

154.     The CNATT Project was scheduled to be completed by Harper Construction on February

11, 2014.

155.     During the performance of the CNATT Project, Harper Construction submitted certified

monthly progress payment requests pursuant to FAR 52.232-5, which the Government paid.

156.     In addition to the aforementioned Harper Construction projects, F-Y was used by Harper

Construction on the Consolidated Parking Structure project at Los Angeles Air Force Base

(hereinafter "the LAAFB Parking Structure Project"), once again, for the purpose of creating

the illusion of compliance with its Subcontracting Plan goals.

157.     Harper Construction was awarded the LAAFB Parking Structure Project on September

28, 2010.  The total value of the prime contract was $7,377,265.  As part of its proposal on

the LAAFB Parking Structure Project, Harper Construction submitted a Subcontracting Plan

which was approved and accepted by the Government, and which became a material part of

Harper Construction's contract with the Government.

158.     Kelsey Gallagher, the Project Manager for Harper Construction on the LAAFB Parking

Structure Project, sent an email to Russ Frazier and Mike Soffa (Frazier Masonry Senior

Estimator) on November 9, 2011, stating:  *I need to purchase your block through a SDVSB.*

*Let me know what the cost of your block (let's keep it simple) is on this job so I can issue the*

*PO to the company.*"  A true copy of the November 9, 2011 email is attached hereto as **Exhibit 11**.

159. A later email from Mike Soffa indicated that the cost of the materials was $30,907.14.

160. Sometime thereafter, Harper Construction subcontracted with F-Y (F-Y Job #F51102) for the purchase of those materials in order to allow Harper Construction to claim credit toward its Subcontracting Plan goals.

161. Harper Construction did in fact claim the F-Y subcontract for materials towards its Subcontracting Plan goals and certified good faith compliance with its Subcontracting Plan, despite Harper Construction knowing that F-Y could not actually qualify as a small business because of its affiliation with Frazier Masonry.

162. On May 31, 2012, Holly Frazier Yowell sent an email to Kelsey Gallagher stating: "*Per your conversation with Russ Frazier today please find attached the final invoice from F-Y Inc. for the block/mortar material purchased for Consolidated Parking Area LA AFB.*"

163. For the masonry work performed on the LAAFB Parking Structure Project, Harper Construction subcontracted directly with Frazier Masonry, at least originally.  However, on February 27, 2012, Kelsey Gallagher emailed Russ Frazier and wrote:  "*Can we re-issue your subcontract to **your sister company F-Y**?  I need to get the DVSB credits and didn't know that you would carry your full contract under that company.*"  (emphasis added).  Russ Frazier responded: "*Is it going to kill you if we don't?  It would be complicated.  Can we talk Thursday?  ...I'm in NC*".  Gallagher further responded: "*Let's.  I'll be in SD the rest of the week.*"  A true copy of the February 27, 2012 email is attached hereto as **Exhibit 12**.

164. The LAAFB Parking Structure Project was completed by Harper Construction on or about August 10, 2012.

165.    During the performance of the LAAFB Parking Structure Project, Harper Construction

submitted certified monthly progress payment requests pursuant to FAR 52.232-5, which the

Government paid.

### b.    Harper Construction Has Engaged in Other Pass-Through Schemes on Government Construction Projects in California

166.    In addition to knowingly utilizing F-Y, a company that could not actually count as a

small business due to its affiliation with Frazier Masonry, in order to misrepresent

compliance with its Subcontracting Plan requirements, Harper Construction also routinely

engaged in fraudulent pass-through schemes whereby Harper Construction would find a

small business (often times, unlike F-Y, a qualified, non-affiliated small business), issue a

sham subcontract to that small business, pay the small business a fee or commission (a small

percentage of the subcontract value) for perpetuating the pass-through, and subcontracting

out the entire amount of the work to a large business. Harper Construction would then claim

the value of the small business subcontract toward compliance with its Small Business

Subcontracting Plan goals.

167.    Harper Construction engaged in such a scheme on the project referred to as "BEQ

Package 5" at Camp Pendleton, and it is illustrative of yet another modus operandi by which

Harper Construction certified "compliance" with its Subcontracting Plans.

168.    The BEQ Package 5 contract was awarded to Harper Construction on September 22,

2009. The total original value of the prime contract was $124,372,557. As part of its

proposal for BEQ Package 5, Harper Construction submitted a Subcontracting Plan which

was approved and accepted by the Government, and which became a material part of Harper

Construction's contract with the Government.

169.    As early as August 8, 2009, Harper Construction and Frazier Masonry discussed the

masonry work on BEQ Package 5.  Frazier Masonry submitted its first proposal for the

project to Harper Construction on August 19, 2009.

170.    On December 18, 2009, Mike Firenze emailed Gary Cox (Frazier Masonry CFO) stating

that "*[i]n an effort to meet our Small Business goals, Harper Construction may ask that*

*Frazier Masonry contract through C&I Grading."[17]*  Firenze asked Cox to look into

"*providing a Dual Obligee Rider*" for Frazier Masonry's bonds and told Cox "*to let us know*

*if there would be any issue so that we can work towards this possible solution to our Small*

*Business Goals.*"  Harper Construction's Rich Davies and Brad Humphrey were also copied

on this email.  A true copy of the December 18, 2009 email is attached hereto as **Exhibit 13**.

171.    On January 31, 2010, Firenze emailed Russ Frazier, stating in relevant part:

> *Attached is the B scope for BEQ Package #5.  **As discussed, we would like to
> run this contract through C&I grading to mitigate Frazier's Large Business
> status.***
>
> *Please review and send back any comments by COB Wednesday.  After all
> comments are received and we are squared away on the scope I would like to
> invite you down to meet with Ed Glasco, owner of C&I Grading, **to ensure we
> are all on the same page as far as the logistics of such a big pass-through.***

(emphasis added).  A true copy of the January 31, 2010 email is attached hereto as **Exhibit

14**.

172.    On March 10, 2010, Harper Construction issued the subcontract for the masonry work on

BEQ Package 5 to C & I Grading in the amount of $12,468,000.  The Schedule "B" in the

subcontract between Harper Construction and C & I Grading included the following

condition:  "**Subcontractor shall be required to subcontract the aforementioned scope, in

its entirety, to Frazier Masonry to perform the work motioned herein.  Any variance**

---

[17] C & I Grading was apparently a woman-owned/Native American-owned small business.

**from this requirement will make this subcontract null and void**." (emphasis in original). Thereafter, in accordance with this provision, C & I Grading "passed through" the subcontract to Frazier Masonry. A true copy of the C & I Grading Schedule "B" is attached hereto as **Exhibit 15**.

173.    But for the pass-through scheme, intended by Harper Construction to allow it to claim compliance with its Subcontracting Plan goals, it made no sense to award a <u>masonry contract</u> to a <u>grading company</u>.

174.    On April 7, 2010, Laura Brullo (Harper Construction Vice President of Construction Accounting) sent an email to numerous Harper Construction employees which stated in relevant part:

> *All, I just spoke with Russ Frazier. He was a little concerned on how the invoicing/payment flow would work with **our "dummy" contract thru C&I.***
>
> *This flow will have to work a little different to make it work, especially since C&I is not too great on their paper flow.*

(emphasis added). A true copy of the April 7, 2010 email is attached hereto as **Exhibit 16**.

175.    On November 3, 2010, Harper Construction terminated its subcontract with C & I Grading.

176.    On November 22, 2010, Harper Construction issued a subcontract to another small business, Tinmen Contracting, Inc., a *roofing* contractor, for the remaining masonry work on BEQ Package 5.[18]

177.    The value of the Harper Construction/Tinmen subcontract was $4,534,359.80. The Schedule "B" in the Harper Construction/Tinmen subcontract contained the same mandate as the C & I Grading subcontract: "**Subcontractor shall be required to subcontract the aforementioned scope, in its entirety, to Frazier Masonry to perform the work motioned**

---

[18] Tinmen is a small disadvantaged business concern.

**herein.  Any variance from this requirement will make this subcontract null and void**.”
In accordance with this provision, Tinmen did in fact subcontract out the entire scope of the
subcontract to Frazier Masonry.  A true copy of the Tinmen Schedule “B” is attached hereto
as **Exhibit 17**.

178.    But for the pass-through scheme, intended by Harper Construction to allow it to claim

compliance with its Subcontracting Plan goals, it made no sense to award a <u>masonry contract</u>

to a <u>roofing company</u>.

179.    Payment requests from Frazier Masonry show that Tinmen received a “facilitation fee” of

$67,010 (or about 1.5% of the subcontract value) for passing through the subcontract to

Frazier Masonry and allowing Harper Construction to use Tinmen’s small business status to

claim compliance toward its Subcontracting Plan goals on BEQ Package 5.  This “facilitation

fee” represents a fraudulent overpayment incurred by the United States, necessitated only by

the pass-through scheme itself.  A true copy of payment requests showing the “facilitation

fee” for Tinmen is attached hereto as **Exhibit 18**.

180.    All of the masonry work on BEQ Package 5 was performed by Frazier Masonry and

nearly the entirety of the subcontracting dollars regarding the masonry work went to Frazier

Masonry, a large business.  Despite this, Harper Construction wrongfully claimed value from

the C & I Grading and Tinmen subcontracts toward compliance with its Small Business

Subcontracting Plan goals.

181.    BEQ Package 5 was completed by Harper Construction on or about August 6, 2011.

182.    During the performance of BEQ Package 5, Harper Construction submitted certified

monthly progress payment requests pursuant to FAR 52.232-5, which the Government paid.

### 3. Harper Construction Made False Statements and Submitted False Claims in Connection with the Courthouse Bay Project and the Projects at Camp Pendleton and Los Angeles Air Force Base

#### a. Harper Construction Did Not Comply in Good Faith with its Subcontracting Plans

183. At all times relevant, F-Y was controlled by Russ Frazier and Frazier Masonry. At all times relevant, F-Y was not, and could not qualify to be, a "small business" for purposes of Subcontracting Plan compliance because of the SBA's "Affiliation Rules," including during the duration of performance of the Courthouse Bay Project, P-1069, P-1109/P-1113, the CNATT Project, and the LAAFB Parking Structure Project.

184. Harper Construction, knowing that F-Y was controlled by Russ Frazier and Frazier Masonry, and therefore was affiliated with Frazier Masonry, subcontracted with F-Y, knowing that F-Y would pass through masonry and concrete subcontracts to Frazier Masonry. Harper Construction subcontracted with F-Y merely so that it could certify to the Government compliance with its Subcontracting Plan goals for the Courthouse Bay Project, P-1069, P-1109/P-1113, the CNATT Project, and the LAAFB Parking Structure Project.

185. The scheme employed by Harper Construction – knowingly using an affiliated subcontractor that could not qualify as a small business in order to pass the work through to a large business and, thereby, to falsely certify compliance with Subcontracting Plan goals – was not good faith compliance with a Subcontracting Plan or FAR 52.219-8 under the relevant regulations and statutes.

186. In addition to the scheme involving Frazier Masonry-affiliated F-Y, Harper Construction knowingly engaged in other pass-through schemes whereby Harper Construction would subcontract with a small business, pay the small business a small fee, dictate that the small

business must subcontract out the entire scope of work, and then claim the small business subcontract toward its Subcontracting Plan goals, despite the fact that a large business actually performed all of the work and received substantially the entire dollar value of the subcontract.

187.    Knowingly using small businesses as mere "pass-throughs" – and forcing those companies to subcontract out the entire scope of work to large businesses – is not a legitimate means of complying with a Subcontracting Plan and is not good faith compliance with a Subcontracting Plan or FAR 52.219-8 under the relevant regulations and statutes.  As stated by the SBA, a pass-through arrangement "**does not comport with the spirit or intent of the subcontracting program.**"  SBLO Handbook, supra, at 77 (emphasis added).

### b.   Fraud in the Inducement

188.    In submitting its Subcontracting Plans and contracting with the Government on the Courthouse Bay Project, P-1069, P-1109/P-1113, the CNATT Project, LAAFB Parking Structure Project, and BEQ Package 5, Harper Construction represented that it would comply in good faith with its Small Business Subcontracting Plan and 15 U.S.C. §637, FAR Subpart 19.7, and FAR §§52.219-8 and 52.219-9.  The representations made by Harper Construction in those plans were false.

189.    As evidenced by its conduct alleged herein, Harper Construction had no intention of actually utilizing small businesses in the performance of numerous of its subcontracts. Instead, Harper Construction intended to subcontract with companies that it knew could not qualify as small businesses in order to create the illusion of compliance with its Subcontracting Plan and then require them to pass through the work to large businesses in order to create the illusion of compliance with its Subcontracting Plan.  Had Harper

Construction not made these false representations, the Government would not have awarded those contracts to Harper Construction. As a result, each and every claim submitted under those contracts was false.

### c. False Certifications in Progress Payment Requests

190. The mandatory certifications that Harper Construction made in connection with its monthly progress payment requests for the Courthouse Bay Project submitted between April 2012 and January 2014, including for work "performed" by F-Y, were false.

191. When submitting its monthly payment requests, Harper Construction expressly certified that "*[t]he amounts requested [were] only for performance <u>in accordance with the specifications, terms, and conditions of the contract</u> . . . .*" (emphasis added). The amounts requested by Harper Construction were not for performance in accordance with the terms and conditions of the contract because Harper Construction instead was acting in direct contradiction of its material contractual obligation to comply in good faith with its Subcontracting Plan and FAR 52.219-8.

192. Instead of complying in good faith, Harper Construction was subverting the purposes and goals of its Subcontracting Plan and the Small Business Subcontracting Program by conspiring with Frazier Masonry to use a Frazier-affiliated company – and therefore an unqualified small business, F-Y – to feign compliance with Harper Construction's Subcontracting Plan goals. In other words, even while certifying that the payments requested were "for performance *in accordance with* the . . . terms[] and conditions of the contract", Harper Construction was in fact performing in a way that was in direct and material breach of its contract with the Government.

193.    In addition, and in the alternative, Harper Construction impliedly certified that it was

complying in good faith with its Subcontracting Plan and FAR 52.219-8, a material

obligation of the contract.   Harper Construction knew that it was bound to this material

contractual obligation.   However, as noted above, Harper Construction was not complying in

good faith with its Subcontracting Plan and FAR 52.219-8 and, thus, was in material breach

of its contract with the Government.

194.    Had Harper Construction not made the aforementioned certifications, Harper

Construction would not have been paid.   See FAR 52.232-5(c). Had the Government known

the truth – that Harper Construction was not complying in good faith with its Subcontracting

Plan and FAR 52.219-8 – the Government would have terminated the contract for default,

imposed liquidated damages, and/or reduced or suspended payments.

195.    Harper Construction made similar false certifications in its requests for payment on P-

1069, P-1109/P-1113, the CNATT Project, the LAAFB Parking Structure Project, and BEQ

Package 5.

### d.  False Statements in Subcontracting Plan Reports

196.    Harper Construction made multiple false statements in the Individual Subcontracting

Reports (ISRs) that it submitted to the Government during the performance of the

Courthouse Bay project.

197.    Harper Construction's April 27, 2012 ISR for the Courthouse Bay Project reported

Harper Construction's progress toward meeting its Subcontracting Plan goals from the

inception of the contract through March 31, 2012, a period prior to Harper Construction's

subcontract with F-Y.   In the ISR, Harper Construction represented that thus far it had

awarded 65.4% of its total subcontract awards to small business concerns generally, which

was below its goal of 75%. Further, Harper Construction represented that it had awarded 2% and 0% of its total subcontract awards to VOSBs and SDVOSBs, respectively, which was below its goals of 4% for each. In the "Remarks" section, Harper Construction stated that "[t]his project is just mobilizing" and that it was "holding a Small Business outreach event near the project location in April to develop small business subcontracting opportunities." Additionally in April 2012, Harper Construction encouragingly told Russ Frazier that Frazier Masonry could be awarded the masonry contract if Frazier would deliver a small to business to hold the subcontract, and asked Russ Frazier if he could his sham SDVOSB small business to pass-through the elevator contract to a large business, ThysennKrupp Elevators.

198. Harper Construction's October 25, 2012 ISR reported Harper Construction's progress in meeting its Subcontracting Plan goals from the inception of the contract through September 30, 2012. At this point, Harper Construction's report included the subcontract awarded to F-Y. In the ISR, Harper Construction represented that it had awarded 79.2% of the total subcontract awards to small business concerns, generally, and 19.3% and 18.2% to VOSBs and SDVOSBs, respectively. These representations were false because F-Y did not qualify as a small business, due to its affiliation with Frazier, for purposes of meeting Harper Construction's Subcontracting Plan goals. Therefore, in actuality, Harper Construction was not meeting its Subcontracting Plan goals, and Harper Construction was not using good faith efforts to do so because it was knowingly using a small business that was affiliated with a large business to falsely represent compliance with its subcontracting goals. Had the contracting officer and the Navy known the truth, the contract with Harper Construction would have been terminated, the contracting officer would have imposed liquidated damages,

and/or payments to Harper Construction would have been suspended or reduced. A true copy of Harper Construction's October 25, 2012 ISR is attached hereto as **Exhibit 19**.

199.    Harper Construction submitted its next ISR on April 25, 2013, after having learned in December 2012 that Frazier Masonry was under federal investigation. In response to having been told about the investigation by Frazier Masonry, Harper Construction forthwith terminated F-Y and Frazier Masonry on all of its jobs – even though Harper Construction had long known that F-Y was Russell Frazier's "SDVOSB small business," and having long known that these companies were affiliated.

200.    The April 25, 2013 ISR reported Harper Construction's Subcontracting Plan progress from the inception of the contract through March 31, 2013. In this ISR, Harper Construction removed F-Y from its Subcontracting Plan goal progress, representing that it had awarded 59.8% of the total amount subcontracted to small business concerns generally and 3.8% and 2.7% to VOSBs and SDVOSBs, respectively. In the "Remarks" section of the ISR, Harper Construction, in explaining its Subcontracting Plan goal shortfall and the dramatic drop in compliance with its goals when compared to the last reporting period, stated:

> *Since the last reporting period*, Harper Construction discovered that a subcontractor [i.e., F-Y] had incorrectly claimed the small business classification of DVOSB. Harper Construction has re-classified that firm as a large business in our reporting system. As a result, the DVOSB, VOSB, and SB subcontracts have decreased since the last reporting period.

(emphasis added). This statement was unequivocally false. The statement declares that Harper Construction had just recently (since October 2012) "discovered" that F-Y was not a small business under the relevant statutes and SBA regulations. To the contrary, however, Harper Construction had known since August 2011 that F-Y was affiliated with Frazier Masonry, and despite knowing this, Harper Construction nevertheless used the affiliated

company in order to assert compliance with its Subcontracting Plan. A true copy of Harper

Construction's April 25, 2013 ISR is attached hereto as **Exhibit 20**.

201.    The foregoing statement in the April 25, 2013 ISR was a brazen attempt by Harper

Construction to cover up its fraud and material breach of its contract with the Government,

motivated by the company having learned that Frazier Masonry and Russ Frazier were under

investigation. Rather than stating the true reason why Harper Construction fell short of its

goals as compared to the previous ISR (which would have exposed that Harper Construction

was defrauding the Government and plainly was not complying in good faith with its

Subcontracting Plan requirements), Harper Construction compounded the deception by

putting forth another false statement of facts to mislead the Government further. At this

point, Harper Construction had, on multiple occasions, violated the False Claims Act.

Despite its obligation to report those violations, Harper Construction attempted to cover up

its fraudulent conduct. Had the contracting officer and the Navy known the truth, the

contract with Harper Construction would have been terminated, the contracting officer would

have imposed liquidated damages, and/or payments to Harper Construction would have been

suspended or reduced.

202.    Harper Construction submitted another ISR for the Courthouse Bay Project on October

29, 2013. In this report, Harper Construction reported that only 65.2% (short of its goal of

75%) of the total amount to be subcontracted had been subcontracted to small business

concerns. In the "Remarks" section, Harper Construction simply said that its "subcontracting

goals have not been met." Harper Construction went on to state the following: "In

conformance with our corporate Small Business Subcontracting Policy, and the associated

Small Business Subcontracting Plan for this contract, Harper Construction has made

considerable efforts to identify, solicit, prequalify and issue subcontracts to small business subcontractors for this project." A true copy of Harper Construction's October 29, 2013 ISR is attached hereto as **Exhibit 21**.

203.    Harper Construction's statement that it made "considerable efforts" to utilize genuinely qualified small businesses as subcontractors rings hollow in the face of substantial evidence otherwise as set forth in this Complaint. Further, although Harper Construction had already committed multiple violations of the False Claims Act, Harper Construction concealed its fraudulent conduct rather than stating the truth or reporting those violations. Had the contracting officer and the Navy known the truth, the contract with Harper Construction would have been terminated, liquidated damages would have been imposed, and/or payments to Harper Construction would have been reduced or suspended.

204.    Harper Construction made similar, if not identical, false statements material to payment in its ISRs during the performance of P-1069, P-1109/P-1113, the CNATT Project, and the LAAFB Parking Structure Project.[19]

205.    Specifically, on P-1069, Harper Construction submitted reports containing material false statements on or about October 2011, April 2012, October 2012, and March 2013 using the Electronic Subcontracting Reporting System ("eSRS").

206.    On P-1109/P-1113, Harper Construction submitted reports containing material false statements on or about October 2012, April 2013, October 2013, and March 2014 using the Electronic Subcontracting Reporting System ("eSRS").

---

[19] Harper Construction undoubtedly made false statements in the SSRs that it submitted during the performance of the projects described herein as well.

207.    On the CNATT Project, Harper Construction submitted reports containing material false statements on or about October 2012, April 2013, October 2013, and February 2014 using the Electronic Subcontracting Reporting System ("eSRS").

208.    On the LAAFB Parking Structure Project, Harper Construction submitted reports containing material false statements on or about April 2012 and August 2012 using the Electronic Subcontracting Reporting System ("eSRS").

209.    Harper Construction made false statements material to payment in its ISRs during the performance of BEQ Package 5 by claiming the pass-through C & I Grading and Tinmen subcontracts, performed by Frazier Masonry, towards its small business subcontracting plan goals.  Those ISRs were submitted on or about April 2010, October 2010, April 2011, and August 2011.  The statements in those ISRs were false because Harper Construction represented that those Government dollars were going to those specific types of small businesses when, in fact, almost all of the dollar value of the subcontracts were going to Frazier Masonry, a large business.[20]

### 4.    Frazier Masonry's Owner/President and Chief Financial Officer Each Pleaded Guilty to a Felony for Their Participation in the Frauds

210.    On September 4, 2013, Frazier Masonry principals Russ Frazier (President and Owner) and Gary Cox (Chief Financial Officer), each pleaded guilty to a criminal indictment charging them with violations of 18 U.S.C. §§ 2 and 1001, for their roles in perpetrating the aforesaid fraudulent schemes.  On May 28, 2014, Frazier and Cox were sentenced as a result of their pleas.

---

[20] Although the statements made in the ISRs during the performance of the Courthouse Bay Project, P-1069, P-1109/P-1113, CNATT Project, and the LAAFB Parking Structure Project, in which Harper Construction claimed the F-Y contracts toward fulfillment of its Subcontracting Plan goals were false because F-Y did not qualify as a small business, those statements can also be said to be false for this reason as well (i.e., that the dollars and percentages were not *actual* subcontracting achievements to the listed small business, but rather were merely pass throughs to an unqualified large business, Frazier Masonry).

## VII.  ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT

### A.  The False Claims Act

211.  This is an action to recover damages and civil penalties on behalf of the United States and

Relator Howard arising from the false and/or fraudulent statements, claims, and acts by

Defendant Harper Construction made in violation of the False Claims Act, 31 U.S.C.

§§3729–3732.

212.  For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

> (A)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim [except that this language applies to all claims pending on or after June 7, 2008];
>
> (C)  conspires to commit a violation of commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
> . . .
>
> (G)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than

$11,000 for each such claim, plus three times the amount of damages sustained by the

Government because of the false or fraudulent claim.  31 U.S.C. §3729(a)(1).

213.  The FCA defines "claim" as:

> (A) mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
>
> > (i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

214.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. §3730.

**B.      Defendant Harper Construction Submitted False or Fraudulent Claims for Payment to the Federal Government**

215.    Defendant Harper Construction knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Government.

216.    These false or fraudulent claims for payment include, but are not limited to, monthly progress payments requests submitted on the Courthouse Bay Project at Camp Lejeune between April 2012 and January 2014 for which Defendant Harper Construction made express and/or implied false certifications that it was complying in good faith with its Subcontracting Plan and FAR 52.219-8.  Had Defendant Harper Construction not made these false certifications, it would not have been paid.

217.    Defendant Harper Construction made similar false or fraudulent claims for payment during the performance of P-1069, P-1109/P-1113, the CNATT Project, and the LAAFB Parking Structure Project, and BEQ Package 5.

218.    As a result of Defendant Harper Construction's fraudulent conduct, the Government has suffered significant damages.

### C.     Defendant Harper Construction Made, Used, or Caused to be Made or Used False Records and/or Statements Material to False or Fraudulent Claims

219.    Defendant Harper Construction knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

220.    These material false statements or records include, but are not limited to, materially false statements and certifications made by Harper Construction when submitting its Subcontracting Plans and entering into contracts with the Government for the construction projects described herein at Camp Lejeune, Camp Pendleton, and Los Angeles Air Force Base, regarding Harper Construction's intention to actually utilize small business concerns. In those statements, Harper Construction represented to the Government that it would make good faith efforts to comply with its Subcontracting Plans and award particular percentages of its subcontracting work to small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, disadvantaged small business concerns, and woman-owned small business concerns. Harper Construction knowingly made these false statements in order to obtain the contracts described herein. Had the United States been aware of these false statements, it would not have awarded the contracts to Harper Construction or paid any claims submitted based upon the materially false statements.

221.    These material false statements or records additionally include, but are not limited to, materially false express and/or implied certifications in support of monthly progress payment requests submitted from April 2012 to January 2014 during performance of the Courthouse Bay Project at Camp Lejeune.   Had Defendant Harper Construction not made those false certifications along with its requests for progress payments, it would not have been paid.

222. Further, these material false statements or records include, but are not limited to, materially false statements in Defendant Harper Construction's Individual Subcontracting Plan Reports (ISRs) dated October 25, 2012, April 25, 2013, and October 29, 2013, with regard to the Courthouse Bay Project. If the Government had known the truth, it would have terminated its contract with Harper Construction, imposed liquidated damages, and/or suspended or reduced payments.

223. Defendant Harper Construction made similar materially false statements or records during the performance of P-1069, P-1109/P-113, the CNATT Project, the LAAFB Parking Structure Project, and BEQ Package 5.

224. As a result of Defendant Harper Construction's fraudulent conduct, the Government has suffered significant damages.

**D. Defendant Harper Construction Conspired to Commit Violations of the False Claims Act**

225. By virtue of planning, and then implementing, its schemes to use affiliated, sham small business companies to fulfill Subcontracting Plan goals, Defendant Harper Construction conspired and confederated with the former defendants to commit violations of the False Claims Act, 31 U.S.C. §3729, including having conspired and confederated to knowingly present false or fraudulent claims for payment or approval; knowingly make, use, or cause to be made or used, false records or statements material to false or fraudulent claims; knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government.

226.     Defendant Harper Construction took substantial steps in furtherance of those conspiracies

by, among other things, utilizing non-qualified, affiliated businesses to claim compliance

with its Subcontracting Plan goals and creating false records which concealed the nature of

its actions regarding its material contractual subcontracting plan obligations.

227.     The United States has suffered substantial damages as a result of the perpetration of the

conspiracies.

**E.     Defendant Harper Construction Failed to Disclose Its Obligation to Repay Money to the Federal Government in Violation of the Reverse False Claims Provisions of the False Claims Act**

228.     In further consequence of the Defendant Harper Construction's fraudulent schemes in

connection with the utilization of non-qualified, affiliated small businesses and small

business pass-throughs to fulfill its Subcontracting Plan goals, Defendant Harper

Construction knowingly made, used, or caused to be made or used, false records and/or

statements to conceal, avoid, or decrease an obligation to pay or to reimburse money to the

Government.

229.     Those false statements and/or records include, but are not limited to, false statements and

representations in Defendant Harper Construction's Individual Subcontracting Reports on

Government construction projects described herein at Camp Lejeune, Camp Pendleton, and

Los Angeles Air Force Base.  In making those false statements, Defendant Harper

Construction intended to avoid its obligation to repay to the United States Government the

amounts it had received as a result of its submission of false claims and/or to avoid its

obligation to pay liquidated damages, and it was reasonably foreseeable that Defendant

Harper Construction's statements would enable it to avoid these obligations.

230.    By virtue of the false records and/or statements that Defendant Harper Construction made, used, or caused to be made or used, or material omissions by Defendant Harper Construction, the United States has suffered substantial monetary damages.

### FIRST CLAIM FOR RELIEF
(FALSE CLAIMS – 31 U.S.C. §3729(a)(1)(A))

231.    The allegations of all paragraphs in this Complaint are incorporated by reference.

232.    In performing the acts described above, Defendant Harper Construction, by and through its agents, servants, officers and employees, knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

233.    The United States government, unaware of the falsity of the claims for payment presented, or caused to be presented, by Defendant Harper Construction, paid claims that it would not have paid if the truth had been known.

234.    As a result of Defendant Harper Construction's conduct, the United States government has been damaged in an amount to be determined at trial.

235.    Additionally, the United States is entitled to penalties of up to $11,000 for each and every false or fraudulent claim made or caused to be made by Defendant Harper Construction.

### SECOND CLAIM FOR RELIEF
(FALSE STATEMENTS – 31 U.S.C. §3729(a)(1)(B))

236.    The allegations of all paragraphs in this Complaint are incorporated by reference.

237.    In performing the acts described above, Defendant Harper Construction, by and through its agents, servants, officers and employees, knowingly made, used, or caused to be made or used, false records or statements, and omissions, material to false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(B).

238.    The United States government, unaware of the falsity of the records and/or statements made, or caused to be made, by Defendant Harper Construction, paid claims that it would not have paid if the truth had been known.

239.    As a result of Defendant Harper Construction's conduct, the United States government has been damaged in an amount to be determined at trial.

240.    Additionally, the United States is entitled to penalties of up to $11,000 for each and every false or fraudulent claim paid or approved arising from Defendant Harper Construction's fraudulent conduct as described herein.

## THIRD CLAIM FOR RELIEF
(CIVIL CONSPIRACY TO COMMIT VIOLATIONS
OF THE FALSE CLAIMS ACT – 31 U.S.C. §3729(a)(1)(C))

241.    The allegations of all paragraphs in this Complaint are incorporated by reference.

242.    In performing the acts described above, Defendant Harper Construction conspired and confederated with the former defendants to commit violations of the False Claims Act, 31 U.S.C. §3729, including having conspired and confederated to have knowingly presented false or fraudulent claims for payment or approval; having knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims; and having knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

243.    As a result of Defendant Harper Construction's conduct, the United States government has been damaged in an amount to be determined at trial.

244.    Additionally, the United States is entitled to penalties of up to $11,000 for each and every

false or fraudulent claim paid or approved arising from Defendant Harper Construction's fraudulent conduct as described herein.

## FOURTH CLAIM FOR RELIEF
### (REVERSE FALSE CLAIMS – 31 U.S.C. §3729(a)(1)(G))

245.    The allegations of all paragraphs in this Complaint are incorporated by reference.

246.    In performing the acts described above, Defendant Harper Construction knowingly used false records and statements to conceal the obligation to pay or to reimburse money to the federal Government, in violation of 31 U.S.C. §3729(a)(1)(G).

247.    Through Defendant Harper Construction's actions of improperly retaining funds to which it was not entitled, the United States has been deprived of the use of these monies and is entitled to recover damages in an amount to be determined at trial.

248.    Additionally, the United States is entitled to penalties of up to $11,000 for each and every violation of 31 U.S.C. 3729(a)(1)(G) Defendant Harper Construction committed.

## FIFTH CLAIM FOR RELIEF
### (VIOLATION OF THE ANTI-KICKBACK ACT, 41 U.S.C. §53)

249.    The allegations of all paragraphs in this Complaint are incorporated by reference.

250.    Defendant Harper Construction, as prime contractor to the United States Government, illegally and unlawfully offered and then provided kickbacks to Frazier Masonry and/or F-Y in connection with the Courthouse Bay BEQ Project, P-1069, P-1109/P-1113, the CNATT Project, and the LAAFB Parking Structure Project, and to C & I Grading and Tinmen on BEQ Package 5.

251.    In its prime contracts with the Government on the aforementioned projects, Defendant Harper Construction made false statements that it had in place, and was following, effective and reasonable procedures designed to prevent and detect possible violations of the Anti-

Kickback Act. Harper Construction's false statements were material to both its obtaining the contracts, and to its claims for payment made during the performance of those contracts.

252. The Anti-Kickback Act expressly states that is illegal for a person to include any kickback in a claim for payment to the Government. On the aforementioned projects, Defendant Harper Construction, in violation of the Anti-Kickback Act, included, directly or indirectly, the amount of kickbacks in the contract price charged to the Government. As a result, those claims for payment which included the cost of the kickbacks were false. Had the Government known the truth, those claims would not have been paid.

253. As a result of Defendant Harper Construction's conduct, the United States government has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

Relator Howard, on behalf of himself and the United States Government, prays as follows:

1. That for violations of the Federal False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter Judgment against the Defendant Harper Construction in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. §3729, *et seq.*, and the costs of this action, with interest, including the costs to the United States;

2. That Relator Howard be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages in the amount of 30% of the proceeds of the action or settlement of the claim, or the maximum allowed under applicable law;

3. That Relator Howard be awarded all costs of this action, together with all expert witness

fees, attorneys' fees, and court costs, as fully as is allowed by law;

4. That a trial by jury be held on all issues; and

5. That the United States Government, and Relator Howard, further receive all relief, both in law and in equity, to which they may reasonably appear entitled.

This the 2nd day of March, 2015.

Respectfully Submitted,

/s/ Charles H. Rabon, Jr.
Charles H. Rabon, Jr.
N.C. State Bar No. 16800
crabon@usfraudattorneys.com
Marshall P. Walker
N.C. State Bar No. 45040
mwalker@usfraudattorneys.com
Gary W. Jackson
N.C. State Bar No. 13976
gjackson@ncadvocates.com
Rabon Law Firm, PLLC
225 E. Worthington Avenue, Suite 100
Charlotte, NC 28203
Tel. 704-247-3247
Fax 704-347-0684

James A. Roberts
N.C. State Bar No. 10495
Lewis & Roberts, PLLC
jar@lewis-roberts.com
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Tel. 919-981-0191
Fax 919-981-0199

*Counsel for Plaintiff-Relator*

OF COUNSEL:

Joel Androphy
Texas State Bar No. 01254700
JAndrophy@bafirm.com
Sarah M. Frazier
Texas Bar No. 24027320
SFrazier@bafirm.com
Rachel L. Grier
Texas Bar No. 24055592
RGrier@bafirm.com
Berg & Androphy
3704 Travis Street
Houston, Texas 77002-9550
Tel.713-529-5622
Fax 713-529-3785

Matt Abbott
Alabama Bar No. AASB-3107-P70A
matt@abbottfirm.com
Abbott Law Firm, LLC
308 Martin Street North
Suite 200
Pell City, AL 35125-1727
Tel. 205-338-7800
Fax 205-338-7816

## CERTIFICATE OF SERVICE

This is to certify that on this date I served a copy of the **RELATOR'S SECOND AMENDED COMPLAINT** which was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of the electronic to the following individuals:

Sarah Carson, Smith Currie & Hancock      secarson@smithcurrie.com

Ronald G. Robey, Smith Currie & Hancock      rgrobey@smithcurrie.com

Steven L. Reed, Smith Currie & Hancock      slreed@smithcurrie.com

Neal Fowler, Department of Justice      Neal.fowler@usdoj.gov


This the 2nd day of March, 2015.




/s/ Charles H. Rabon, Jr._____

Charles H. Rabon, Jr.